## INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Plaintiff,

v.

## GENERAL TELEPHONE & ELECTRONICS CORPORATION and Hawaiian Telephone Company, Defendants.

### Civ. No. 2754.

United States District Court, D. Hawaii.

Feb. 28, 1978.

Vernon F. L. Char, Damon, Shigekane, Key & Char, Honolulu, Hawaii, Maxwell M. Blecher, Blecher, Collins & Hoecker, Los Angeles, Cal., Howard J. Aibel, Edwin A. Kilburn, Daniel R. Solin, Grant S. Lewis,

LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiff.

Marshall M. Goodsill, Martin Anderson, Goodsill, Anderson & Quinn, Honolulu, Hawaii, Milton Handler, Stanley D. Robinson, Michael Malina, Kaye, Scholer, Fierman, Hays & Handler, New York City, Thomas R. Mulroy, Mark Crane, Hopkins, Sutter, Mulroy, Davis & Cromartie, Chicago, Ill., for defendants.

PENCE, District Judge.

## DECISION AFTER POST–REMAND TRIAL

This is the latest chapter in this continuing antitrust saga, the first three installments of which may be found at 296 F.Supp. 920 (D.Haw.1969) (*GTE I*); 351 F.Supp. 1153 (D.Haw.1972) (*GTE II*); and 518 F.2d 913 (9th Cir. 1975) (*GTE III*). The International Telephone and Telegraph Corporation (ITT) filed this suit in this court in 1967 against the General Telephone and Electronics Corporation (GTE). The gravamen of its complaint was that GTE, through a series of acquisitions both of telephone operating companies and of telephone equipment manufacturers, and through its subsequent business behavior that flowed from those acquisitions, had violated the Clayton and Sherman Acts as well as the Hawaii state antitrust statute, and thus foreclosed ITT from sales in a legally significant portion of the telephone equipment market.

In *GTE I,* this court swept away, on plaintiff's motion to strike, a number of defenses—statute of limitations, laches, estoppel, unclean hands—which GTE had interposed on its behalf. *GTE II* was this court's decision on the merits: the challenged acquisitions and practices violated Clayton § 7 and Sherman § 1 with respect to the national market—and their Hawaiian statutory analogues with respect to the state market—in telecommunications equipment (switching, telephone apparatus, and radio transmission, excluding wire and cable) for the market consisting of "independ-

ent" telephone operating companies (*i. e.,* excluding the American Telephone and Telegraph system—AT&T or Bell), and ITT as a private "attorney general" had standing to request divestiture and mandatory injunctive relief.

On appeal, the Ninth Circuit, in *GTE III,* affirmed in part and reversed in part, and remanded. It held that divestiture is not available to private antitrust plaintiffs (although full injunctive relief is); that the defense of laches is or may be available to GTE; that AT&T purchases were or may have been improperly excluded from the market defined, as were purchases by customers not telephone operating companies and all potential purchases by telephone subscribers; and that, as to the Hawaii state statute, the relevant market should not have been limited to opportunities for sales to Hawaiian buyers. Further, this court was directed to determine the anticompetitive effect of each individual GTE acquisition. A more complete history of the case may be obtained by reference to the decisions cited above.

Thus on remand, *ITT v. GTE* is again before this court. By stipulation of the parties, the latest clash is to be limited initially to ITT's claim that GTE has committed a Sherman § 1 violation, based on analysis of GTE's in-house purchasing policy *i. e.,* the alleged practice of requiring its telephone operating companies to purchase equipment requirements from GTE's affiliated equipment manufacturers, principally Automatic Electric (AE) and Lenkurt.

The parties have agreed that this court's decision may be made on the basis of the record now before it. They have additionally stipulated as to the annual share of all purchases of telephone equipment in the United States represented by GTE operating companies from affiliated manufacturers for each year from 1945 to 1969, both including and excluding Bell purchases as part of the total market.[1] GTE's share in 1969 came to 7.41% with Bell included, and 37.72% with Bell excluded.

---

**1.** Post Remand Order # 3.

ITT's basic position here is that GTE, "acting in concert with its subsidiaries, adopt[ed] an in-house purchasing policy, which, wholly apart from its acquisitions, produced an actual trade restraint in violation of Sherman Act § 1" in foreclosing ITT and other equipment manufacturers from GTE's portion of the telephone equipment market.[2] GTE, in rebuttal, asserts that ITT has not previously raised this claim, which GTE asserts is groundless on the merits,[3] and that in any event the Federal Communications Commission (FCC) has exclusive jurisdiction over the matters at issue.[4]

The limited determination of § 1 legality now to be made by this court thus requires a preliminary disposal of several points: (1) may ITT now raise this allegation? (2) if so, may GTE now raise the defense of exclusive jurisdiction? (3) if so, does the FCC in fact have exclusive jurisdiction?

(1) *May ITT now raise its Sherman § 1 claim?*

■ GTE posits that ITT has not previously raised the § 1 claim now asserted, and, by implication, that ITT should now be estopped from presenting new claims on remand. However, ITT brought its original complaint under the Sherman Act as well as the Clayton Act, *GTE II, supra,* 351 F.Supp. at 1161, and it is clear that ITT there challenge GTE's in-house purchasing practices. *Id.* at 1161, 1188–94, 1196–98. Moreover, this court there *found* a § 1 violation based on GTE's "mergers and consolidations, and * * * *subsequent actions and conduct* in effectively foreclosing the market for telephone equipment represented by the GTE telephone operating companies, [which] constituted a *continuing* combination in unreasonable restraint of interstate trade * * *." *Id.* at 1198 (emphasis added). It is thus manifest that the impact of GTE's in-house purchasing was considered separately from the impact of its acquisitions; therefore ITT is free to make its § 1 claim; it is not new matter.

(2) *May GTE now raise the defense of exclusive FCC jurisdiction?*

■ Since subject matter jurisdiction is never waived, may be raised at any point during litigation, and must in fact be raised by the court itself if the parties fail to do so, therefore, GTE may assert this defense. *Louisville & Nashville R. R. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908); Federal Rule of Civil Procedure 12(h)(3).

(3) *Does the FCC have exclusive jurisdiction?*

GTE claims that, with the exception of acquisitions and mergers, the FCC "has exclusive jurisdiction to regulate the vertical dealings between telephone company common carriers such as the operating companies of the General System and affiliated manufacturers of telephone equipment such as Automatic Electric." More specifically, its claim is that the regulatory scheme effected by statute and agency upon telephone companies has worked an implied repeal of the antitrust laws with respect to them; that by the 1934 Communications Act (FCA) Congress committed to the FCC all supervision of interstate wire and radio communication, which subsumes regulation of telephone company equipment purchases from affiliated manufacturers. The essence of FCC authority, says GTE, is rates and profits, which necessarily goes to costs and therefore the reasonableness of equipment prices.[5]

GTE also points out that the FCC is currently involved in a complex administrative proceeding (FCC Dkt. 19129) involving the relationship between Bell and its affiliated manufacturer Western Electric (WE), and therefore covering much of the same

---

2. ITT's Statement of Position on Remand, ¶ 1, p. 1.

3. Defendants' Statement of Position on Remand, ¶ 1, pp. 1–4.

4. Defendants' Memorandum in Support of Motion to Dismiss Plaintiff's Claim Under Section 1 of the Sherman Act, p. 1.

5. *Ibid.*

ground as here; that ITT and GTE are parties to that proceeding; and that therefore this court should not interfere by passing on related antitrust questions. Since the FCC could in its present proceeding regulate telephone equipment purchases from affiliated manufacturers, says GTE, an antitrust court could rule inconsistently on the same issue, and the possibility of such a conflict requires that antitrust immunity be implied to make the regulatory scheme work.[6] GTE relies largely on two recent U. S. Supreme Court decisions, *Gordon v. New York Stock Exchange (Gordon),* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), and *United States v. National Association of Securities Dealers (NASD),* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975), which, GTE asserts, establish the following "fundamental proposition":

> Antitrust does not apply to activity (1) subject to the regulation of a federal administrative agency which has supervisory responsibility over that activity which (2) could result in a standard of conduct duplicative of or inconsistent with that established by the antitrust laws, (3) whether or not the agency has actually exercised its jurisdiction to approve or disapprove the challenged conduct.[7]

ITT contradicts, claiming that only in cases of plain repugnancy between regulation and antitrust is exclusive agency jurisdiction—antitrust immunity—implied, and regulated industries are so exempted only to the extent legislated by Congress, with such implied exclusion disfavored. The relevant factors leading to a finding of immunity, asserts ITT, are (1) congressional intent to immunize, (2) conflict between regulatory and antitrust standards, and (3) continuing regulatory supervision. None of those factors is present here, maintains ITT. The current FCC administrative proceeding goes to rates, which could only regulate equipment procurement practices indirectly. Moreover, again to paraphrase ITT's argument, the FCC has never sought to regulate such practices nor concerned itself with their impact on competition in the telephone equipment market. Its jurisdiction over telephone operating companies does not extend to equipment manufacturers.[8]

A regulatory statute may of course contain an express immunity from the antitrust laws for specified transactions. Thus, FCA § 221(a) expressly exempts mergers and acquisitions between telephone companies if specifically approved by the FCC. Similarly, combinations between common carriers approved by the Interstate Commerce Commission (ICC) pursuant to the Interstate Commerce Act § 5(11) are shielded. *In Re REA Express, Inc., Private Treble Damage, Etc.,* 412 F.Supp. 1239, 1261 (D.C.) (*REA*).

Antitrust immunity may also arise by implication. This is because there may be instances where regulation by an agency conflicts with judicial decision by an antitrust court; in such instances, the court may be required to give way in appropriate circumstances. As a general rule, such implied repeal of the antitrust laws—representing as they do a fundamental national economic policy—is strongly disfavored and not to be assumed lightly. It is to be found only in case of a plain repugnancy between the regulatory scheme and operation of the antitrust laws, where it is necessary to make that regulatory scheme work as intended, and then only to the minimum extent necessary.[9]

6. *Id.* at 13.

7. *Id.* at 23.

8. ITT Memorandum in Opposition to GTE's Motion to Dismiss.

9. *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966) (*Carnation*); *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (*Otter Tail*); *Mt. Hood Stages v. Greyhound Corp.,* 555 F.2d 687 (9th Cir. 1977) (*Mt. Hood Stages*); *Gordon; United States v Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); (*Philadelphia Bank*); *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973) (*Ricci*); *Ma-*

An examination of the cited cases shows the single most important factor in determining the immunity question is that of congressional intent: did Congress *intend* in passing the applicable regulatory statute to immunize the transactions or behavior at issue from the antitrust laws? "Whether conduct Congress has made subject to administrative regulation is exempt from the antitrust laws depends upon Congress' intent." [10]

Such intent may be found, or not, from a variety of sources: the statutory language itself, the legislative history of the regulatory scheme in question, the pervasive nature of that regulatory scheme on its face or in continuous practice and supervision, an irreconcilable conflict between regulation and the operation of the antitrust laws, the inclusion and relative weight of competitive concerns in the statutory standards to be applied by the agency, and primary anticompetitive effect of the behavior in question on the regulated industry along with

agency expertise and incentive to exercise its authority.[11]

■ Consonant with the notion that antitrust immunity is bestowed grudgingly and then just to the minimum extent necessary (see note 9, *supra* ), exclusive administrative jurisdiction, if it is found at all, will not ipso facto work a blanket exemption for the relevant industry, but rather will apply to the particular and discrete activities and circumstances deemed to have been intended by Congress.[12]

■ As indicated by the cited cases, antitrust immunity is found only where judicial analysis has determined that for the regulatory structure to fulfill its functions as intended by Congress, the particular actions of the regulatory agency, then in question, must be immunized from antitrust restraints. In almost none of the cases concerned with the immunity issue, when the

com Products Corp. v. American Telephone & Telegraph Co., 359 F.Supp. 973, D.C. (Macom); United States v. Manufacturers Hanover Trust, 240 F.Supp. 867 (S.D.N.Y.1965) (Manufacturers Hanover); Mobilfone of Northeastern Pa. v. Com. Tel. Co., 428 F.Supp. 131 (E.D.Pa.1977); Wolfson v. Artisans Savings Bank, 428 F.Supp. 1315 (D.Del.1977) (Wolfson); Radzanower v. Touche Ross & Co., 426 U.S. 148, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1975) (no implied repeal of venue provision in National Bank Act); GTE III at 918, 935; Federal Maritime Commission v. Seatrain Lines, Inc., et al., 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1972) (Seatrain); NASD; Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) (Silver); Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (Cantor); United States v. American Telephone & Telegraph Co., 427 F.Supp. 57 (D.D.C.1976), cert. denied, 429 U.S. 1071, 97 S.Ct. 824, 50 L.Ed.2d 799 (1977), affirmed by D.C. Circuit 5/26/77, cert. denied, 434 U.S. 966, 98 S.Ct. 507, 54 L.Ed.2d 452 (1977) (AT&T); United States v. National Broadcasting Co., Inc., 73 TC ʼ 74,885 at 95,989 (C.D.Cal. 1973) (NBC); Cavanagh Communities Corp. v. New York Stock Exchange, 422 F.Supp. 382 (S.D.N.Y.1976) (Cavanagh) (Bankruptcy Act and Exchange Act).

10. Mt. Hood Stages, at 691. See also Gordon; Pan American World Airways, Inc. v. United States, 371 U.S. 296, 312, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963) (Pan Am); AT&T at 60;

Ricci, 409 U.S. at 302 n. 13, 93 S.Ct. 573; Philadelphia Bank, 374 U.S. at 352, 83 S.Ct. 1715; Seatrain, 411 U.S. at 729, 93 S.Ct. 1773; United States v. Radio Corporation of America, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959) (RCA).

11. See Gordon; NASD; Otter Tail; Seatrain; AT&T; Hughes Tool Co. v. Trans World Airlines, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) (Toolco); Philadelphia Bank; Manufacturers Hanover; Foremost International Tours v. Qantas Airways Ltd., 525 F.2d 281, 284 (9th Circuit 1975) (Foremost); NBC. But see REA at 1259 n. 51. Ricci; Macom; Federal Communications Commission v. Sanders Brothers Radio Station, 309 U.S. 470, 473, 60 S.Ct. 693, 84 L.Ed. 869 (1940) (Sanders Bros.); Federal Communications Commission v. Radio Corporation of America, 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953) (FCC v. RCA); GTE Service Corp. v. Federal Communications Commission, 474 F.2d 724, 733–34 (2d Cir. 1973) (GTE Service). But see Mt. Hood Stages at 692.

12. Gordon, 422 U.S. at 688–89, 95 S.Ct. 2598; Carnation, 383 U.S. at 220, 86 S.Ct. 781; Pan Am, 371 U.S. at 312, 83 S.Ct. 476; Mt. Hood Stages at 691. See also Toolco, 409 U.S. at 387, 93 S.Ct. 647; NASD, 422 U.S. at 734–35, 95 S.Ct. 2427; Maryland & Virginia Milk Producers Association, Inc. v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960).

agency involved was the FCC, has immunity been implied.[13]

The Ninth Circuit, in *Industrial Communications Systems, Inc. v. Pacific Telephone & Telegraph Co.*, 505 F.2d 152 (1974) (*Industrial Communications*), has held that extensive regulation of telephone companies does not unconditionally preclude antitrust actions against them.[14]

Judge Waddy in the District Court for the District of Columbia recently addressed a question similar to the one now before this court, in *AT&T, supra*, 427 F.Supp. 57. In that case the U.S. Government has sued AT&T and its subsidiaries for monopolization in the telecommunications equipment market, and seeks, inter alia, divestiture of WE by AT&T. WE is AT&T's wholly-owned manufacturing subsidiary, just as AE/Lenkurt is GTE's wholly-owned manufacturer. Defendants interposed the defense, among others, that they were impliedly immune from antitrust attack because of the pervasive regulation imposed on them by the FCC and state agencies, which regulation is based on the "public interest" standard and therefore at odds with antitrust's competitive concerns.

Interestingly, the FCC itself, filing an amicus brief on the question of exclusive jurisdiction raised in *AT&T*, did not claim blanket antitrust immunity for the telecommunications industry under its regulatory eye. The FCC brief urged exclusive jurisdiction over matters involving (1) FCA § 214 certification regarding entry into or exit from a communications common carrier market, (2) FCA § 201 orders requiring interconnection, and (3) FCA § 205 tariffs approved or prescribed by the Commission.

Judge Waddy analyzed:

When faced with implied immunity questions, the courts have undertaken a case-by-case approach which analyzes the particular industry, the applicable regulatory scheme and procedures, and the statutory history to determine whether operation of the antitrust laws can be reconciled with the regulatory scheme.

427 F.Supp. at 59–60. He concluded that nothing in the legislative history of federal regulation of the telecommunications industry reflected a congressional intent to confer a blanket immunity. Nor did such immunity arise from the statutory language, or from the mere fact of regulation even if pervasive, or from the recent administrative proceedings of the FCC.[15] Judge Waddy stated that

[i]n each instance * * * the concern has been whether different and potentially conflicting standards with respect to particularized activities and conduct may result, thereby threatening the agency's ability to carry out its regulatory mandate. Immunity is to be implied only where it is necessary to make the regulatory statutes work, and even then only to the minimum extent necessary.

*Id.* at 61, citing *Silver, Gordon*, 422 U.S. at 682–83, 95 S.Ct. 2598, *NASD*, 422 U.S. at 719–20, 95 S.Ct. 2427 all *supra*. Judge Waddy's decision demonstrates the continued judicial disinclination to find antitrust immunity and in a context not grossly dissimilar from the instant suit.

What we have, then, after a review of most of the cases, is an ocean of antitrust punctuated by isolated islands of implied immunity. GTE claims, however, that the most recent of the relevant Supreme Court pronouncements, *Gordon*, 422 U.S. at 659,

---

**13.** *RCA; Macom; Carter v. American Telephone & Telegraph Co.*, 250 F.Supp. 188 (N.D. Tex.1966), *affirmed*, 365 F.2d 486 (5th Cir. 1966), *cert. denied*, 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967) (*Carterphone*); *Radio Broadcasting Company v. Bell of Pennsylvania*, 325 F.Supp. 168 (E.D.Pa.1971) (*RBC*); *Chastain v. American Telephone & Telegraph Co.*, 351 F.Supp. 1320 (D.D.C.1972) (*Chastain*).

**14.** *See also Citizens Utilities Co. v. AT&T*, 1973 2 TC ' 74,756, p. 95,297 (N.D.Cal.1973)

(*Citizens Utilities*); *NBC*; *Phonetele, Inc. v. American Telephone & Telegraph Co.*, 435 F.Supp. 207 (C.D.Cal.1977) (*Phonetele*); *DASA Corporation v. General Telephone Co. of California*, No. CV 73–2511–LTL (5/10/77) (*DASA*).

**15.** *Cf.* "Note: AT&T and the Antitrust Laws: A Strict Test for Implied Immunity." 85 Yale L.J. 254 (1975).

95 S.Ct. 2598, and *NASD*, 422 U.S. at 694, 95 S.Ct. 2427, have pushed up a whole continent of exemption and have sent the waters rolling.[16]

A close reading of *Gordon* reveals that the statutory language of the SEA, the pervasive nature of SEC supervision, and the danger of collision with antitrust standards, all played parts in convincing the court that Congress had intended SEC regulation to displace the antitrust laws in the fixing of exchange commission rates. But *Gordon* notes that immunity is disfavored and is found only in plain instances of antitrust/regulatory conflict. Even then, it is only in a discrete and particular set of circumstances, that the court finds such immunity when based upon a clear expression of congressional intent drawn from a number of sources, most especially specific statutory language.

*NASD* was decided the same day as *Gordon*, but it produced a 5–4 split decision rather than a second unanimous opinion. *NASD* found antitrust immunity for vertical restrictions on secondary market activities imposed by a national association of securities dealers, such immunity being implied in the 1940 Investment Company Act § 22(f), and for a horizontal combination of securities dealers in the national association, that immunity being implied in the SEC's pervasive exercise of regulatory authority under the Act and also under the Maloney Act, which exercises repeatedly weighed competitive concerns. In *NASD*, the majority found immunity implied from a pervasive exercise of regulatory supervision, and additionally from the incorporation of antitrust factors into the regulatory standards.

It appears that the *NASD* court applied the *Gordon* "test", established in the context of an *actual* antitrust/regulatory conflict based on statutory language, to a situation of mere *possible* or *potential* conflict in *NASD*, and a possibility, moreover, unlikely to be consummated, given the agency's failure to previously address the matter in issue. The Court couched its decision in well-established axioms: clear repugnancy, immunity not favored, reconcile the two regimes if possible, antitrust to give way if necessary to make regulation work.

*NASD* could be characterized, as it was by this court in oral hearing December 29, 1975, as a deviation from the general line of law, but a deviation only in that the Supreme Court

> found that, in the SEC problems before it, Congress, while not articulating the proposition quite as clearly as the majority would [have] prefer[red] it, nevertheless, indicated sufficiently that here was an area that was particularly and peculiarly within the purview of the regulatory agency and that * * * if the antitrust aspects of the problem were allowed to interfere with the agency's regulatory powers * * * it really [would impinge] * * * directly upon what Congress had intended for the agency to handle.

Transcript of Hearing, 52–53.

The Supreme Court, subsequently, clearly appeared to reject an expansive interpretation of *NASD*. In *Cantor*, the Court stated flatly that

> [t]he Court has consistently refused to find that regulation gave rise to an implied exemption without first determining that exemption was necessary in order to make the regulatory act work, and even then only to the minimum extent necessary.

It also quoted with approval Justice Stewart's concurring opinion in *Gordon* in which he stated:

> The Court has never held, and does not hold today, that the antitrust laws are inapplicable to anticompetitive conduct simply because a federal agency has jurisdiction over the activities of one or more of the defendants.

The mere possibility of conflict between antitrust and regulation is insufficient. 428 U.S. at 596–98, 96 S.Ct. 3110.

---

**16.** *See* Defendants' Memorandum in Support of Motion to Dismiss, *supra*, p. 23.

Turning then to the immediate problem, GTE claims that §§ 403 and 218 of the FCA together give the FCC expansive jurisdiction such as to oust this court of antitrust jurisdiction over ITT's present complaint. Transcript of Hearing, *supra*, at 12. GTE also offers, additionally or alternatively, as sources of FCC jurisdiction over telephone company/supplier relationships, FCA § 215, and the entire FCA subchapter II on Common Carriers as vesting in the agency regulatory authority over all aspects of interstate wire and radio communication, including telephone operating company purchases from affiliated equipment manufacturers. *Ibid.*

Section 218 grants to the Commission broad authority to make inquiries of and obtain information from carriers subject to its authority, *i. e.*, for our purposes telephone operating companies. (See FCA § 153(h).) Section 403 authorizes the Commission to make an inquiry on its own motion as to any matter which may be the subject of a complaint brought before it, or which may arise under the Act's provisions, or which relate to the enforcement thereof. Section 215 orders the Commission to examine, among others, any common carrier transactions relating to the furnishing of equipment which may affect service or rates, and to report to Congress thereupon, along with any recommendations for legislation to police those transactions.

GTE argues that equipment purchases by pervasively regulated telephone companies is at the heart of FCC jurisdiction, and that FCC jurisdiction is not limited to rates (which, says GTE, would be sufficient jurisdiction in this instance, anyway, because the cost of equipment is a factor in the rate base), but includes regulation of purchase-sale relations between a regulated telephone company and its affiliated equipment manufacturer.

In support of this proposition, GTE cites FCC Dkt. 19528 where the Commission dispensed with an interconnect coupler requirement, based on competitive considerations. Since the same question of equipment purchases is before the agency in Dkt. 19129, GTE maintains there is a *Gordon* threat of antitrust/regulatory collision and inconsistent standards of conduct, especially with regard to relief. *GTE Service,* where the FCC had expressly not asserted jurisdiction over data processing, is, according to GTE, thereby to be distinguished from the present case, where the FCC does assert jurisdiction over equipment purchases. It must be again noted, however, in *AT&T,* the FCC has expressly *declined* the very jurisdiction which GTE claims the Commission has asserted!

ITT, on the other hand, claims that the Commission's jurisdiction over equipment purchases is indirect through its rate power, that the agency has not sought such regulation, and that in any event it could not extend its authority to a non-regulated industry such as telecommunications equipment manufacture, analogous to the tour market in *Foremost.* 525 F.2d 281, *supra.*

There are thus two questions for the court here to answer. The first is, does the FCC have power to regulate the operating company/equipment manufacturer relationship? Second, if so, is that power exclusive? The answer to the first is "only indirectly," which, based on the above analysis of the implied immunity doctrine, ineluctably answers "no" to the second.

■ The heart of FCC jurisdiction is over rates and services.[17] Congressional intent in creating the Commission was to supervise rates and service in the telecommunications industry to ensure protection of the public interest,[18] and uniform, nondiscriminatory treatment of customers with regard thereto.[19]

17. *See* FCA §§ 201 205.

18. *Id., e. g.,* § 201(a). The public interest standard similarly applies to other communications media. *See, e. g.,* FCA §§ 303, 307(a), (d),

309(a), (f), 310(b)(4), (d); *Sanders Bros. RCA; FCC v. RCA.*

19. FCA §§ 202(a), 203(c); *Vaigneur v. Western Union Telegraph Co.,* 34 F.Supp. 92 (D.Tenn.

■ Commission jurisdiction over telephone equipment procurement practices is indirect at most, limited to the effect of equipment costs upon the rate structure.[20] The significance of FCC jurisdiction, if any, over equipment purchasing being indirect at most is that, as the Supreme Court recently noted, "[r]ecent cases make it clear that the relevant aspect of the agency's jurisdiction must be sufficiently central to the purposes of the enabling statute so that implied repeal of the antitrust laws is 'necessary to make the [regulatory scheme] work.' ' " [21]

The plain language of § 215 makes quite clear that the agency does *not* have direct jurisdiction over equipment purchases, but may only report to Congress on further legislation with respect to the same. Furthermore, "the legislative history of the [Communications] Act reveals that the Commission was not given the power to decide antitrust issues as such, and that Commission action was not intended to prevent enforcement of the antitrust laws in federal courts." *RCA,* 358 U.S. at 346, 79 S.Ct. at 464 (speaking in context of television regulation).

The "primary anticompetitive effect" of GTE's challenged behavior is upon the telecommunications equipment industry, represented by plaintiff ITT, over which industry the FCC has no direct authority. Therefore it is not exempt from antitrust. *Foremost; GTE Service.*

As noted in oral decision on December 29, 1975, "the circuitous method suggested by the defendants here of attempting to regulate non-regulated companies by means of going into the costs and the effect of those costs of telecommunication instruments

upon the ultimate rate structure is not that showing of clear repugnancy between the antitrust laws and the regulatory system which is demanded even by the [NASD] majority * * * [for] implied immunity * * *." Transcript of Hearing at 54.

There is neither statutory language nor legislative history, nor a pattern of past FCC regulation, pervasive or not, nor an instance of present FCC regulation, nor an irreconcilable conflict—or any conflict at all—between the regulatory and antitrust regimes, such as to evidence congressional intent that the relationship between telephone operating company and affiliated equipment manufacturer be immune from antitrust attack.

No antitrust immunity may be implied for the dealings between carrier and manufacturer presented in this case. FCC regulation of telephone companies does not exempt them from operation of the Sherman Act. This court properly has jurisdiction over the complaint.

*Primary Jurisdiction*

■ The question nevertheless arises whether, under the doctrine of primary jurisdiction, the court in its discretion ought to defer reaching a decision until the FCC has had the opportunity to determine issues of fact within its special expertise. Although neither party here has raised this point, as it is a jurisdictional matter, it is incumbent upon this court to examine this possibility sua sponte. *Louisville & Nashville R.R. v. Mottley, supra,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126, F.R.Civ.P. 12(h)(3).

■ It has already been held here that the FCC has no jurisdiction to directly reg-

1940); *Postal Tel.-Cable Co. v. Associated Press,* 228 N.Y. 370, 127 N.E. 256 (1920); *American Trucking Associations, Inc. v. FCC,* 126 U.S.App.D.C. 236, 241, 377 F.2d 121, 126 (1966), *cert. denied,* 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874.

20. The Commission's own position is that it "does not directly regulate the manufacture and supply of telephone equipment or terminal devices used in connection with the telephone system." FCC amicus brief in *AT&T,* p. 16 of the brief. "The Commission has no direct reg-

ulatory responsibility for the non-operating activities and affiliates of the Bell System, *i. e.,* WE and Bell Laboratories, although the Commission's function requires it to ensure that no unreasonable rates and regulations result from the vertically integrated AT&T structure." *Id.* at 21.

21. *Cantor,* 428 U.S. at 597–98 n. 37, 96 S.Ct. at 3120 n.37 quoting Robinson, Recent Antitrust Developments: 1975, 31 Record of N.Y.C.B.A., 38, 57–58 (1976).

ulate telephone equipment manufacturers; since that is basically what the present complaint concerns, the rationales for primary referral disappear.

As this court previously held, and as it holds again in a different context, "[w]hile admittedly the FCC would have primary jurisdiction if GTE's *rates and practices relating thereto* were here being challenged under the antitrust laws, ITT's action is not so bottomed. The FCC has no jurisdiction over the problems of this case, in its present posture." *GTE II,* 351 F.Supp. at 1168 (emphasis added, citation omitted).

Here, the FCC does not directly regulate the telecommunications equipment market, on which a substantial adverse effect is claimed. Therefore, primary jurisdiction is inapplicable.

### FINDINGS OF FACT

This court adopts as its own the Findings of Fact set out in Appendix A and Subappendices 1–4 attached hereto. They are, essentially, as submitted by ITT and for convenience this court has used ITT's numbering. Save for stipulated figures necessary to reflect the post-appeal market and market shares, it may be noted that of the 64 findings, 61 are the same in substance and sometimes verbatim as this court found them in *GTE II, id.* at 1168, et seq. Findings 29, 63 and 64 speak for themselves. Therefore this court, after full and careful review thereof, did not feel it necessary to revamp or reword or change, materially, ITT's "Proposed Findings." This court also carefully studied GTE's proposed findings and save as to the few which parallel ITT's or are undisputed, finds them essentially to be argumentative conclusions, without merit on the record. This court perforce rejects them.

22. ITT's Statement With Respect to its Sherman § 1 Claim, September 8, 1975 (ITT Statement), incorporated as Exhibit A into Post-Remand Order No. 3, January 6, 1976, I at 1–2.

23. Defendants' Post Remand Brief in Opposition to Plaintiff's Claim Under § 1 of the Sherman Act, May 3, 1976 at 6, 20, 39, 54.

*Positions of the Parties*

ITT's Sherman 1 claim is that GTE and its subsidiaries, by acquiring AE and Lenkurt and also numerous telephone operating companies, and by implementing an in-house purchasing policy whereby the telecommunications equipment requirements of the General System, *i. e.,* its telephone operating companies, are inexorably channeled to AE/Lenkurt, have unreasonably restrained trade in foreclosing this area of the equipment market from competition, with a Sherman 1 anti-competitive intent and result. ITT adds that the alleged violation does not depend upon any one acquisition, or all of the acquisitions together, alone constituting a violation of Sherman 1 or Clayton 7.[22]

GTE makes a number of counter-arguments. First, it argues that the acquisitions in question must be assumed to be legal for Sherman 1 purposes, and, relying heavily on *United States v. Columbia Steel,* 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948), (*Columbia Steel*), that the in-house purchasing which flows therefrom is natural and therefore necessarily also legal. Second, GTE asserts that, even so, its stipulated 7.4% of the total telecommunications equipment market is insufficient foreclosure to violate Sherman 1, and that in any event actual foreclosure is less than 7.4%. Finally, and with chutzpa, defendants argue that the intent in their purchasing policies is plainly lawful.[23]

ITT responds that in-house purchasing is legal only so long as it does not constitute an unreasonable restraint of trade, that the foreclosure here in light of industry circumstances is sufficient to ground a finding of Sherman 1 illegality, and that GTE's activities had anti-competitive intent.[24]

24. Reply Brief of International Telephone and Telegraph Corporation With Respect to its Claim Arising Under § 1 of the Sherman Act, July 7, 1976, at 8–12, 20–21, 24.

*Legal and Factual Analysis*

This case is presented here in something of an unusual posture. The more common vehicle for a challenge to the activities flowing from or related to an acquisition or acquisitions is a direct attack on the acquisitions themselves, under Clayton 7. ITT took this route in the original District Court proceeding, and succeeded in *GTE II.*

On appeal, however, the Ninth Circuit ruled that, absent a discretionary finding by this court on remand that equitable reasons existed for ITT's delay or that no prejudice had accrued to GTE by reason of delay, ITT's challenges to certain of the acquisitions would be barred by a four-year laches period. *GTE III*, 518 F.2d at 926.

As the suit was filed in 1967, the barred acquisitions would include Leich (acquired in 1950), AE (1955), Lenkurt (1959), Theodore Gary & Co. (1955), Peninsular Telephone (1957), Sylvania (1959, but already ruled not illegal, *GTE II* at 1196), and Panhandle Electric (1962). Those not barred would be California Water & Telephone Co., West Coast Telephone Co., The Southwestern States Telephone Co., and Western Utilities Corp. (all 1964), Central Iowa Telephone Co., Hawaiian Telephone Co., and Northern Ohio Telephone Co. (all 1967).

Since the meat of ITT's complaint is the vertical relationship between the GTE operating companies and their affiliated equipment manufacturers AE/Lenkurt, the application of laches to bar a challenge to acquisition of the latter would gut ITT's Clayton 7 claim.

The Ninth Circuit also noted, however, that "When the relief sought in a § 16 suit is an injunction forbidding recurrence of the violation (*e. g.,* adherence to an anticompetitive purchasing policy), it would seem proper, as a basic and initial proposition, to measure the laches period from the time when the violation occurred rather than from the time of the prior merger. * * * * An exception to the limitations doctrine exists for continuing acts. *Hoopes v. Union Oil Co. of Calif.*, 9 Cir., 374 F.2d 480 at 486. * * * ITT cannot justify viewing GTE's *acquisitions* together as a continuing violation of the antitrust laws in order to avoid the defense of laches. * * However, other 'acts' allegedly committed by GTE, such as adherence to a restrictive purchasing policy, may well fall within the continuing-acts exception. The district court should explore this matter on remand." *GTE III* at 928, 929.

■ The net effect of the above direction is that this court may hold that ITT's challenge to the continuing and. ongoing in-house purchasing practiced by the General System is not barred by laches, and with certainty, on the evidence before it, this court does so hold. The challenged antitrust violation here is GTE's "entire course of conduct directed to the establishment and maintenance" of in-house purchasing, and with each successive acquisition (save that of Sylvania), GTE's implementation and imposition of its in-house purchasing policy has ever increasingly eliminated competition in its acquired portion of the market. *Hoopes,* 374 F.2d at 486. That conduct continues today and, barring court action or other not dissimilar circumstances, will carry on tomorrow. Clearly it is logically absurd that ITT could be deemed "dilatory" in challenging such conduct, for then its challenge would never be timely, and alleged violations would have been irrevocably "grandfathered" into a legislatively and judicially-unintended immunity from attack.

Plainly, ITT has presently eschewed its § 7 claim, and has instead elected to press on with its § 1 allegations, to avoid the effect of laches. Under the appellate ruling it is now barred from attempting to undo some of the more important GTE acquisitions, in particular AE/Lenkurt, and so has turned to battling the anticompetitive consequences of those acquisitions, *i. e.,* in-house procurement. ITT is not here challenging the legality of the acquisitions *qua* acquisitions, under § 7, but only as they constitute an integral part of the § 1 combination alleged to have structured and implemented the purchasing practices in question. It must here be noted in this regard that the plaintiff's § 1 claim is not a new

matter; it was raised, and decided in ITT's favor, in the first go-round. *GTE II* at 1198. Even that conclusion must, however, be reconsidered in light of *GTE III.*

This court has already found that the General System adheres to an in-house purchasing policy which forecloses other equipment manufacturers from the GTE share of the market, and that such policy and foreclosure is *not* a result of better product quality, price, or service on the part of the affiliated supplier AE/Lenkurt. *GTE II* at 1188–93, 1196–97. *Cf.* also, Findings 50–55, *infra.* Market foreclosure is the cutting off of competition, the fundamental wrong at which the antitrust laws are aimed. What would seem to remain, then, since the above findings were not disturbed on appeal and cannot be challenged now, is an analysis of whether the quality and quantity of foreclosure here, in light of the appellate court's directions on market redefinition (see discussion infra), is sufficient to place GTE's practices beyond the pale of permission.

There is an initial consideration, however, that GTE urges precludes such an analysis. GTE's position, paraphrased, is that ITT *cannot* forego an attack on the acquisitions and instead challenge the resulting practices; that ITT's § 1 claim is expressly indifferent to the legality of the General acquisitions, that the acquisitions must therefore be assumed to be legal (or tantamount to internal expansion), that in-house purchasing follows as a natural and legal consequence of a legal vertical acquisition (or internal vertical expansion), and that GTE's procurement policy is thus automatically valid. GTE reads *Columbia Steel*, the only case even arguably in point, to say that in-house buying is expected to flow from vertical integration, and that if the integration withstands antitrust attack, so does the buying. Where the foreclosure resulting from such an acquisition approaches the level of a § 1 violation, GTE implies, the acquisition itself must violate the lower incipiency threshold of Clayton 7. Since ITT cannot sustain its § 7 claim, GTE implies

further, it is now trying to get in through the back door via Sherman 1.

Certainly most antitrust plaintiffs who object to a defendant's acquisitions, and the consequences thereof, will proceed under § 7 and not § 1 precisely because the former's standard of illegality is easier to satisfy. Indeed, that is why the present posture of this case is so unusual, and why there is a poverty of precedent.

 Due to the laches issue, however, and legal strategy decisions on the part of ITT, plaintiff here is now unable to go the § 7 path. This, ipso facto, does not mean the way of § 1 is blocked as well. Acquisition-related conduct can be proscribed by § 1 when it cannot be reached by § 7; such conduct can violate § 1 without necessarily violating § 7.

Here, Clayton § 7 illegality would have to be found to exist for each acquisition individually (*GTE III* at 935), whereas the § 1 claim is based on a single, continuous unitary trade practice—in-house purchasing—flowing from the acquisitions as they now exist *en masse.* In short, the Sherman § 1 whole can be more than its Clayton 7 parts. Even were this not so, however, even if § 1 could not be violated separate and apart from § 7 here, ITT would not be barred.

*Columbia Steel* is a § 1 case decided in a 5–4 split decision in 1948, before enactment of the present-day § 7. The United States challenged U.S. Steel's acquisition of the assets of Consolidated Steel, which purchased 3% of the total rolled steel products in the relevant Western U.S. market. One of the charges was that U.S. Steel, a producer of rolled steel, would lessen competition to the extent of foreclosing other producers from Consolidated's share of the market.

The Court held that the acquisition reflected a normal business purpose [25] and did not unreasonably restrict the opportunities of competitor producers of rolled steel to market their product,[26] and that the market share was only 3% "[and] may be expected

---

**25.** *Columbia Steel,* 334 U.S. at 533, 68 S.Ct. 1107.

**26.** *Id.* at 524, 529, 68 S.Ct. 1107.

to be lower * * * in the future." [27] Vertical integration was not per se illegal; its legality was to be determined by, inter alia, "characterizing the nature of the market to be served, and the leverage on the market which the particular vertical integration creates or makes possible * * * [and] the purpose or intent with which the combination was conceived. When a combination through its actual operation results in an unreasoanble restraint, intent or purpose may be inferred." [28]

Some of the factors to be considered in determining the Sherman 1 legality of a vertical integration are "the percentage of business controlled, the strength of the remaining competition, whether the action springs from business requirements or purpose to monopolize, the probable development of the industry, consumer demands, and other characteristics of the market. * * * * The relative effect of percentage command of a market varies with the setting in which that factor is placed." [29]

Speaking specifically to in-house purchasing, in a passage important to this case, the Court noted that a "subsidiary will in all probability deal only with its parent for goods the parent can furnish. That fact, however, does not make the acquisition invalid. When other elements of Sherman Act violations are present, the fact of corporate relationship is material and can be considered in the determination of whether restraint or attempt to restrain exists. * * Exclusive dealings * * * brought about by vertical integration or otherwise, are not illegal, at any rate until the effect of such

control is to unreasonably restrict the opportunities of competitors to market their product." [30]

The relevant portion of the Court's holding can be summed up as follows: vertical integration is not illegal per se, but is to be analyzed on a case-to-case basis where the claim is one of unreasonable restraint of trade; more specifically, a subsidiary's not unnatural tendency to buy or sell in-house is not illegal unless the "combination through its actual operation" unreasonably forecloses the market to competitors of the parent or subsidiary.

The reaction to *Columbia Steel* resulted in the 1950 amendments to Clayton 7; Congress passed an anti-merger and assets-acquisition statute with a lower "incipiency" standard so as to reach transactions such as those validated in that decision.[31]

It is for this reason that few if indeed any major cases after *Columbia Steel* really speak to the legality of a merger or acquisition under the Sherman Act; [32] they don't have to; plaintiffs can more easily meet the incipiency standard of Clayton 7 and so move under that provision. This is not to say, however, by any means, that Sherman 1 does not speak to mergers or acquisitions. It may condemn them as unreasonable restraints of trade just as it may any other business conduct.[33] *Columbia Steel* makes this point explicit; it just so happened, in the circumstances of *that* case, that the acquisition in question did *not* amount to such a restraint.

27. *Id.* at 527, 68 S.Ct. at 1124.

28. *Id.* at 524, 68 S.Ct. at 1123; *see also* at 524 n. 23, 68 S.Ct. 1107, quoting *United States v. Paramount Pictures*, 334 U.S. 131, 173–74, 68 S.Ct. 915, 937, 92 L.Ed. 1260: " 'In the opinion of the majority the legality of vertical integration under the Sherman Act turns on (1) the purpose or intent with which it was conceived, or (2) the power it creates and the attendant purpose or intent.' "

29. *Id.* 334 U.S. at 527–28, 68 S.Ct. at 1124.

30. *Id.* at 523–24, 68 S.Ct. at 1122.

31. *Philadelphia Bank,* 374 U.S. at 340, 83 S.Ct. 715; *see also Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 741 (2d Cir. 1953) (*Hamilton Watch*); *United States v. Bethlehem Steel Corporation,* 168 F.Supp. 576, 582 (S.D.N.Y.1958).

32. An exception is *United States v. First National Bank & Trust of Lexington,* 376 U.S. 665, 669–70, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964) (*Lexington Bank*) which went to a horizontal merger.

33. *See, e. g., Brown Shoe Co., Inc. v. United States,* 370 U.S. 294, 328, 333, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (*Brown Shoe*).

**1174**

Time and again cases have held that *Columbia Steel* is to be restricted to its own special set of facts,[34] as indeed the Court there impliedly admonished and explicitly set out in analytical framework.[35]

GTE claims that *Columbia Steel* means that if a vertical acquisition is legal, so is the in-house purchasing, since the one follows the other as the night the day. Transcript of Hearing, August 18, 1976, at 43.

That interpretation, however, is ·precisely backwards: what *Columbia Steel* says is that *if* the in-house purchasing is legal—*i. e.*, it does not amount to an unreasonable vertical restraint of trade—*then* so is the merger or acquisition from which it flows. GTE has erroneously and reversely interchanged analysis and conclusion in its interpretation of the decision.

Nevertheless, even were this court to construe *Columbia Steel* as fully applicable, it does not doom ITT. Conceding that in-house purchasing is a probable consequence of vertical integration, and is not per se illegal, nevertheless such action may violate § 1 just as any other unreasonable restraint of trade when the facts of a given case are considered.

That courts have not had to deal with acquisitions under § 1 because such cases are ordinarily brought under § 7, does not mean that acquisition cases *cannot* be brought under § 1. They can, as *Columbia Steel* explicitly makes clear.[36] It is simply ITT's misfortune that under *GTE III*, § 7 is not here available to it; it has, then proceeded under § 1 and attempted to meet the heavier burden of proof therein.

■ A potential problem arises, however. ITT is attacking GTE's acquisitions not in and of themselves, but rather for fostering, as an integral part thereof an in-house purchasing policy. And presumably, since in the Ninth Circuit divestiture is

not now available to a private party in an antitrust suit (*GTE III* at 920), any relief granted ITT would definitely focus on the in-house purchasing practice but perhaps, leave the facts of acquisitions and corporate relationship intact. Nothing in the antitrust law *requires* an antitrust plaintiff to attack or have standing to effectively undo the underlying fact (or cause) rather than the overt manifestation (or fact) of a violation.

■ GTE, though, insists that since ITT is *not* challenging the legality of the acquisitions here, thus the acquisitions are legal, and, ergo, so must be the in-house purchasing. Were its actions as pure as GTE paints them, this assertion might have some merit, *e. g.*, if for example, only a single legal acquisition were involved. But a series of acquisitions, even if severably legal, may when assembled together produce a synergistic effect of restraining trade. GTE's claim is untenable. To repeat, the court of appeals has ruled that this court, on remand, should make "consistent findings of legality or illegality with respect to each acquisition * * * because ITT's request for relief is grounded on the theory that the acquisitions and accompanying trade *practices* constituted *actual* violations of the Sherman and Clayton Acts." *GTE III* at 935 (first emphasis added).

Here, however, ITT is challenging a trade *practice,* in-house dealing, and not the illegality of the acquisitions *qua* acquisitions. It would appear obvious that a series of acquisitions can generate collectively a unitary practice that restrains trade under § 1, even though not necessarily individually amounting to as much as a violation of § 7. *Cf. United States v. Jerrold Electronics Corp.,* 187 F.Supp. 545, 536, 566 (E.D.Pa. 1960), *aff'd* per curiam, 365 U.S. 567, 81

**34.** *Lexington Bank,* 376 U.S. at 672, 84 S.Ct. 1033; *Philadelphia Bank* 374 U.S. at 342 n. 20, 83 S.Ct. 1715; *United States v. Third National Bank in Nashville,* 390 U.S. 171, 181, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968) (*Nashville Bank*); *Manufacturers Hanover. See also Tampa Electric Co. v. Nashville Co.,* 365 U.S. 320, 328, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) (*Tampa Elec-*

*tric*) and Areeda, Antitrust Analysis (1967 ed.), ¶ 623.

**35.** *Columbia Steel,* 334 U.S. at 523, 525, 527–30, 68 S.Ct. 1107.

**36.** *Ibid.*

S.Ct. 755, 5 L.Ed.2d 806 (1961) (*Jerrold Electronics*). As this court sees it, such is the proper characterization of ITT's complaint.

However, even if a § 7 violation *were* inextricably linked with § 1 abuses here, ITT's stance would still be permissible. In explaining why, the court must disabuse GTE of a number of express or implied theories it holds.

GTE's first thesis is that somehow ITT *must* bring a Clayton 7 claim if such necessarily accompanies its Sherman 1 claim in this fact situation. As stated heretofore, there is no such requirement. Antitrust complaints need not cover every possible ground for violation, nor need they be tidily packaged so as to encompass all directly relevant antitrust law. Plaintiffs may pick and choose, and courts will examine what charges and allegations are so presented to them.

The fact that ITT is by judicial fiat now equitably barred by laches from mounting a § 7 assault on many of GTE's earlier acquisitions does not in the least mean that those transactions were or are *not* violations of § 7. Under *United States v. E. I. du Pont de Nemours & Co.,* 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957) (*du Pont*), the government at least could attack them as such. The laches doctrine, as now applied here, simply means that GTE's acquisitions appear to be immune from *private* antitrust attack four years after their consummation; it does *not* perforce make those acquisitions legal. Laches is an equitable and procedural bar which quite flatly has nothing to do with abstract substantive and legal merits. Therefore, a court in this context is entirely free to find § 7 violations as incidents to a Sherman 1 claim that itself is not barred by laches. The § 1 claim stands on its own, procedurally.

Nevertheless, GTE seems to maintain that ITT has (somehow) stipulated, for purposes of the § 1 claim now before the court, that GTE's acquisitions are legal. This court can only find that ITT has done nothing of the sort. Rather, ITT has asserted that the alleged § 1 violation does not depend upon the illegality, under either § 1 or § 7, of GTE's *acquisitions. See* n. 22, *supra.* At most, it could be construed as a putative stipulation that the court *need* not make preliminary enquiry into the legality of the acquisitions, per se, in examining the challenged practices flowing from them; it does not mean that the court *cannot* make such enquiry, even less does it mean that the court cannot make a conclusory finding with respect to the acquisitions *qua* acquisitions incidental to and following its disposition of the main claim. Contrary to GTE's repeated assertions, the court does not "have to" "assume" anything.

*Columbia Steel* and other cases [37] have said that in-house purchasing is the natural or logical or probable result of vertical integration. A practice that is "natural" in a business sense is not necessarily always legal.[38] Indeed, if all "natural" business conduct were legal, there would be no need for the antitrust laws. Although an earlier argument is that if the natural result of an acquisition restrains trade, it follows that the acquisition itself will have a tendency to lessen competition or will restrain trade. Nevertheless it is not absolutely necessary that a vertical acquisition engender in-house dealing, and even less necessary that any such dealing not be the result of free competition. The corporate affiliation could remain, and with it the profits from each company, while vertical dealings were still conducted on an arms' length, open market basis.

The question, then, is does foreclosure of 7.4% of the total telecommunications equipment market, in light of all the relevant

---

**37.** *Jerrold Electronics. See also Independent Iron Works, Inc. v. U. S. Steel Corp.,* 322 F.2d 656 (9th Cir. 1963); *Dipson Theatres, Inc. v. Buffalo Theatres, Inc.,* 190 F.2d 951 (2d Cir. 1951), *cert. denied,* 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 691 (1952).

**38.** *See United States v. Kimberly-Clark Corp.,* 264 F.Supp. 439, 448 (N.D.Cal.1967) (*Kimberly-Clark*), citing *United States v. Pennzoil Co.,* 252 F.Supp. 962, 984 (W.D.Pa.1965).

industry characteristics, unreasonably restrain trade?

Initially, this court must refer to its findings and conclusions in *GTE II.* "The General System policy of 'standardizing' on AE(Lenkurt) products and resistance to use of non in-house equipment effectively forecloses competing manufacturers from selling competing products to the General System. * * * whether one takes the independent telephone industry to constitute the relevant market, as this court has done, *or* takes the total telephone industry market, as GTE insists, in *either* market there has been a most substantial foreclosure of competition flowing from the vertical integration and continued horizontal merger policy of GTE." 351 F.Supp. at 1196–97 (emphasis added).

On appeal, the Ninth Circuit dismissed this court's statement that *either* market definition gave rise to substantial foreclosure (and therefore, by implication, restraint of trade) as "hypothetical" and "speculative" because (1) this court *did* ground its findings in the independent market, and (2) even if it alternatively found a violation in the larger, Bell-inclusive market, it "committed other errors in defining the market", viz: exclusion of purchases by non operating-company customers, and of all potential purchases by telephone subscribers from manufacturers not affiliated with the operating company serving those subscribers. *GTE III* at 932–33.

As to (1), this court in *GTE II* stated in what it thought was plain language that restraint of trade existed also in the larger market, *as defined by GTE,* based on GTE's share therein. 351 F.Supp. at 1187, 1196–97. As to (2), correction of the "other errors" complained of above has reduced

GTE's market share from 7.9% (*id.* at 1196) to 7.4%.[39] So this issue is back before this court six years after this court believed it had decided it.

So be it. In the present posture of the complaint, this court will now attempt to follow the appellate court's directions. Unquestionably vertical foreclosure is one of the evils to which antitrust law and the Sherman Act in particular may address itself; it is a "clog on competition"[40] and can be a restraint of trade.[41] The Sherman Act § 1's central policy is "against contracts which take away freedom of purchasers to buy in an open market."[42]

As has been noted above, and as the cases indicate, the normal route for challenging the effects of an acquisition is § 7. Therefore, perforce, most relevant precedents will consist of § 7 cases. Since it is exclusive in-house dealing that is the nub of ITT's challenge, § 3 cases will also be used in analysis, since § 3 normally provides an easier standard for plaintiffs to meet.

■ Where the Sherman § 1 restraint of trade alleged is market foreclosure—as contrasted to a per se violation such as a group boycott or a tie-in—§ 1 focuses on the same concerns and factors as Clayton § 7 and § 3, albeit judging by the stricter standard of *actual* restraint over and beyond mere incipiency. The difference, in this context, between Clayton and Sherman violations is one of degree and not of kind. *See Brown Shoe, supra,* n. 41, 370 U.S. at 328, 82 S.Ct. 1502. Business behavior which violates the Clayton Act's incipiency standards may also be so egregious and effective as to rise to the level of, and constitute, Sherman Act restraints of trade. *Id.* at 328, 333, 82 S.Ct. 1502. Therefore, Clayton Act cases dealing with similar behavior are persuasively in-

**39.** Exhibit B, Post-Remand Order # 3, *supra.*

**40.** *Standard Oil of California v. United States,* 337 U.S. 293, 314, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) (*Standard Stations*).

**41.** *Brown Shoe,* 370 U.S. at 323–24, 82 S.Ct. 1502. See also *United States Steel Corp. v. FTC,* 426 F.2d 592, 599 (6th Cir. 1970) (*U. S.*

*Steel v. FTC*); *Kimberly-Clark* at 446, 463; *Mississippi River Corp. v. FTC,* 454 F.2d 1083, 1091 (8th Cir. 1972) (*Mississippi River*); *Manufacturers Hanover* at 935.

**42.** *FTC v. Brown Shoe Co.,* 384 U.S. 316, 321, 86 S.Ct. 1501, 1504, 16 L.Ed.2d 587 (1965), FTC § 5 case. *See also U. S. Steel v. FTC* at 601.

structive,[43] all the while recognizing and deferring to the higher standard of illegality mandated by the Sherman Act and ITT's concomitant burden necessary to sustain its application here.[44]

■ It is axiomatic that a percentage figure for a market foreclosure is not, per se, usually antitrust-determinative. Market share, where between de minimum and blatant monopoly proportions, can only be fairly assessed in light of all the many other relevant industry circumstances.[45] Thus, antitrust violations have been founded on vertical market foreclosures of as low as 1–2% [46] or even less than 1%.[47] The only § 1 case on vertical foreclosure through acquisition is *Columbia Steel,* where a 3% foreclosure which 'was expected to decline was held legal.[48]

■ Relevant factors in assessing the *real* impact of foreclosure include:

*(a)* —the degree of existing concentration in the industry as well as any trend towards concentration. A highly concentrated or concentrating industry will magnify the anticompetitive impact of foreclosure.[49]

*(b)* —the degree of existing vertical integration in the industry as well as any trend towards vertical integration. A highly vertically integrated or integrating industry will magnify the anti-competitive effect of vertical foreclosure.[50]

*(c)* —the nature and type of arrangement involved; less permanent relationships such as contracts, or more socially useful business behavior such as internal expansion, are less likely to be found illegal than foreclosure by acquisition or merger. As stated in *U. S. Steel v. FTC,* 426 F.2d at 598 n. 14:

> While vertical integration by internal generation creates many of the same evils as does such integration by acquisition, it is not a specific subject of concern [under] . . . § 7. The most frequent explanation given for not proscribing internal generation of vertical facilities is that such expansion generates an additional competitive factor in the market place, rather than merely changing the ownership of an existing competitive unit. Hence, it is more likely than acquisition of existing facilities to intensify product, price and service competition. Also, such internal generation being less likely to succeed because one must compete with the existing utilization of facili-

---

43. *See Brown Shoe,* 370 U.S. at 328, 82 S.Ct. 1502; *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1275 (9th Cir. 1975) (applies Clayton 3 analysis to a contract challenged under Sherman 1; of course, greater showing of anti-competitive effect required under latter).

44. *See GTE II,* 351 F.Supp. at 1219.

45. *Columbia Steel,* 334 U.S. at 527–28, 68 S.Ct. 1107 (§ 1 case); *Brown Shoe,* 370 U.S. at 328–29, 82 S.Ct. 1502 (§ 7); *Lexington Bank,* 376 U.S. at 672, 84 S.Ct. 1033 (§ 1); *Tampa Electric,* 365 U.S. at 327, 81 S.Ct. 623 (§ 3) quoting *Standard Stations,* 337 U.S. at 299 n. 5, 69 S.Ct. 1051 (*cf.* discussion of evolution from Standard Stations "quantitative substantiality" § 3 test to Tampa Electric's "qualitative substantiality"); *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1248 (3d Cir. 1975); *see also Curly's Dairy, Inc. v. Dairy Cooperative Association,* 202 F.Supp. 481, 484–85 (D.Or.1962); *Susser v. Carvel,* 332 F.2d 505, 516 (2d Cir. 1964); *Manufacturers Hanover* at 927 (§§ 1, 7).

46. *United States v. Standard Oil Co.,* 253 F.Supp. 196 (D.N.J.1966) (*Standard Oil*) (§ 7); *Brown Shoe,* 370 U.S. at 303, 334, 82 S.Ct. 1502 (§ 7); *see also Kimberly Clark,* (2% in alternative national market).

47. *United States v. Kennecott Copper Corp.,* 231 F.Supp. 95 (S.D.N.Y.1964), *aff'd* per curiam, 381 U.S. 414, 85 S.Ct. 1575, 14 L.Ed.2d 692 (1965) (*Kennecott Copper*) (§ 7).

48. *See* nn. 25–30, *supra.*

49. *Brown Shoe,* 370 U.S. at 332, 82 S.Ct. 1502; *Philadelphia Bank,* 374 U.S. at 365 n. 42, 83 S.Ct. 1715; *United States v. Continental Can,* 378 U.S. 441, 461–62, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); *United States v. Aluminum Co. of America,* 377 U.S. 271, 279, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1963); *Kennecott Copper; United States v. Chrysler Corp.,* 232 F.Supp. 651, 656 (D.N.J.1964); *Mississippi River* at 1091; *Manufacturers Hanover* at 936, 941.

50. *Kennecott Copper; U. S. Steel v. FTC* at 597, 600; *Kimberly-Clark* at 446; *Mississippi River* at 1091; *Standard Oil* at 214, 226.

ties is less dangerous to competition in the market place (citing *Kennecott Copper* at 102–04, 104 n. 6; *Brown Shoe*, 370 U.S. at 329–30, 332 n. 55, 82 S.Ct. 1502).

*(d)*—the intent and purpose behind the challenged conduct. This is related to the type and nature of the arrangement in question, just discussed above. Intent may not be relevant per se but may be helpful in interpreting the purpose and effect of the behavior; [51]

*(e)*—the availability of alternative marketing outlets for foreclosed competitors. The less available alternatives, the more likely illegality; [52]

*(f)*—the introduction of an "irrelevant and alien factor" into free choice among competing products in a given market. The presence of such a factor will invite condemnation; [53]

*(g)*—entry barriers in the affected market. The higher the entry barrier, the more anti-competitive the foreclosure; [54]

*(h)*—the degree of market leverage, if any, possessed by the foreclosing entity.[55]

As a threshold matter, GTE urges that its stipulated 7.4% of the market is not tantamount to an equal degree of foreclosure. It argues that it would supply a healthy chunk of that 7.4% even without the existing vertical integration because (1) the GTE operating companies historically bought large amounts of telecommunications equipment from AE/Lenkurt prior to acquisition, and (2) over and above that, replacement parts are ordinarily purchased from the original equipment manufacturer.[56] This is at odds with this court's implicit finding in *GTE II* that *all* of GTE's market share was foreclosed.[57]

ITT in its Reply Brief cites a number of cases for the proposition that courts include pre-acquisition vertical dealings as part of the market foreclosed by the acquisition, to wit, *Kennecott Copper, Columbia Steel,* and *Kimberly-Clark.* In *Kennecott Copper,* Kennecott's sales to the acquired company Okonite had declined to nothing prior to the merger. 231 F.Supp. at 97–98. In *Kimberly-Clark,* the court made reference to foreclosure of "increased sales" but it did *not* exclude pre-existing figures from its computations. 264 F.Supp. at 463–64. In *Columbia Steel,* since even including the pre-existing sales of rolled steel by U.S. Steel to Consolidated (about one-half of the post-acquisition share) [58] that the 3% share in a declining market was held legal, gives rise to a strong inference that any increase in percentage or a different state of the market would not have been so approved. However, no case has been cited (or found) wherein final vertical market share figures excluded prior dealings.

**51.** *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *Columbia Steel,* 334 U.S. at 524, 527, 533, 68 S.Ct. 1107; *Kimberly-Clark* at 463; *Mississippi River* at 1091; *Chisholm Brothers Farm Equipment Co. v. International Harvester Co.,* 498 F.2d 1137, 1143 n. 13 (9th Cir. 1974) (*Chisholm Brothers*).

**52.** *Columbia Steel,* 334 U.S. at 524, 68 S.Ct. 1107; *Borman's, Inc. v. Great Scott Super Markets, Inc.,* 75–1 TC ¶ 60,321, p. 66, 299 at 66,304 (E.D.Mich.1975); *Refrigeration Engineering Corp. v. Frick Co.,* 370 F.Supp. 702 (W.D.Tex. 1974); *Kimberly-Clark* at 463.

**53.** *FTC v. Consolidated Foods Corp.,* 380 U.S. 592, 594, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965) (condemning reciprocal buying under § 7 and citing *International Salt Co. v. United States,* 332 U.S. 392, 396–97, 68 S.Ct. 12, 92 L.Ed. 20 and *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 3, 6, 12, 78 S.Ct. 514, 2 L.Ed.2d 545); *DeVoto v. Pacific Fidelity Life Ins. Co.,* 516 F.2d 1, 6 (9th Cir. 1975) (desire to keep business within corporate family group).

**54.** *Standard Oil* at 225.

**55.** *Columbia Steel,* 334 U.S. at 524, 68 S.Ct. 1107; *Jerrold Electronics* at 560 (presence of market leverage invites special scrutiny); *Otter Tail,* 410 U.S. at 377, 93 S.Ct. 1022; *Mt. Hood Stages* at 696 n. 22.

**56.** GTE Brief in Opposition to ITT's § 1 Claim, May 3, 1976, at 39.

**57.** 351 F.Supp. at 1197 ("an actual foreclosure of meaningful sales competition in 46% (GTE's full market share) of the relevant (independent) market").

**58.** *United States v. Columbia Steel Co.,* 74 F.Supp. 671, 676 (D.Del.1947).

A court must look to the realities of the marketplace in determining foreclosure. Nevertheless, using the entire telecommunication equipment market as blocked out by *GTE III*, at least the full 7.4% is not an improper measure here. While the test for foreclosure in a § 7 setting is future-oriented, in a § 1 case the court looks backward to see if actual foreclosure and restraint of trade have occurred. Obviously, at the time of each of GTE's acquisitions the foreclosure, which is now in the past, would have been then in the future. Therefore, although a § 1 claim might not *then* have been successfully proved, now, through the passage of time and events, it can; the foreclosure analysis is the same. What *would* reasonably appear to be foreclosed in the future under § 7 *has* been actually foreclosed in the past under § 1; the two measures are the same. And that same measure necessarily includes at least all of the stipulated 7.4%.

If the court of appeals can validly postulate that "[t]here is thus no basis for concluding that Bell's purported foreclosure of a large fraction of the telephone equipment market is an immutable fact of market life" (*GTE III* at 931), then with at least equal certainty it can be said that there is, or was at the time of each of the acquisitions in issue, no basis for concluding that AE/Lenkurt's historic share of the pre-acquisition operating companies' purchases would continue come hell or high water, come competition or no. Much telephone equipment is compatible. *GTE II* at 1183.

Of importance, too, is the proven fact that GTE has used its integrated structure to (1) keep prices at a high, non-discounted level, when a non-affiliated manufacturer might well offer volume discounts to the General operating companies as a group and thus win their business, were there no GTE-affiliated manufacturer (*id.* at 1193), and (2) resist "introduction into the General System of improved equipment until AE or Lenkurt makes it" (*id.* at 1192), again designedly and positively foreclosing its market share because of its integrated structure.

In short, GTE has *actually* used its vertical structure to irrevocably foreclose its full market share of 7.4% by taking every means to exclude any chance, howsoever small, of *any* portion of it being served by competitor manufacturers no matter how superior their products, service, or prices. To put it another way, the portion of GTE's 7.4% which might represent the "historic" pre-acquisition equipment sales is no longer won or retained on a competitive basis, as it was before GTE foreclosed it upon acquisition of the operating companies. Therefore it is not the same portion, qualitatively or quantitatively, as it was before acquisition and consequently cannot be related back.

The same reasoning applies with equal force to replacement parts, since the original equipment may well have been purchased after foreclosure. In the posture of the case it would be incumbent on GTE to show otherwise, and it has not. Moreover, the increasingly rapid rate of technological change and research and development in telecommunications equipment may well have mooted much of GTE's "replacement parts" argument. In any event, this court has already found that new types of products bought from non-affiliated competitors would have replaced existing GTE equipment but for vertical integration and GTE's policy of resisting use of such products until AE/Lenkurt made them. *Ibid.*

This court can but conclude that GTE's in-house purchasing policy has foreclosed a full 7.4% of the gross relevant market.

Moving now to other relevant factors in assessing the anti-competitive impact of that policy:

(a) *Degree of existing concentration in the telecommunications equipment market as well as any trend towards concentration*

WE has supplied and supplies 99% + of Bell's equipment requirements (*id.* at 1176) and thus has an equipment market share of about 80%, given that the parties' stipulation as to GTE's shares of the Bell-inclusive

and Bell-exclusive [59] lead to a Bell purchasing share of 80.36%.[60]

Since AE/Lenkurt has a lock on General System purchases, then, together, two firms—WE and AE/Lenkurt—control over 87% of the equipment market. Furthermore, only three other firms manufacture "a relatively full line of telecommunications equipment for sale to telephone operating companies in the U. S.," to wit, Stromberg-Carlson, North Electric and ITT. *Id.* at 1172.

The sum picture thus is one of an extraordinary degree of concentration in equipment manufacturing and sales. The deleterious impact of any anti-competitive behavior in that market is thus grossly magnified.[61] Moreover, the concentration of equipment *customers* is correspondingly great, and this also has magnified the effect of business behavior in the manufacturing market. *See GTE II* at 1198.

The question of a trend towards concentration is mooted because a "trend" really goes to future effect, and § 1 is concerned with actual restraints in the past; here, a heavy concentration has already been developed. Similarly, that such concentration may not be immutable in the *future* is irrelevant to the fact that it *has existed,* and was in existence when this action was heard.

(b) *Degree of existing vertical integration in the telephone industry as well as any trend towards vertical integration*

ATT is vertically integrated. GTE is vertically integrated. Together they command almost or roughly 90% of the telephone industry. *Id.* at 1186. The degree of existing vertical integration is thus almost absolute, leaving virtually no room for any fur-

ther trend, although GTE has certainly exhibited such a trend and an intent to continue it in its past drive towards vertical integration. *Id.* at 1198.

Thus, competitors of WE and AE/Lenkurt, in factual reality, have been and are foreclosed from all but a tiny slice of the U. S. market. Even before GTE's vertical integration, ATT had vertically foreclosed over 80% of the market, and had been guaranteed that market by the 1955 Consent Decree, so the impact of GTE's vertical integration on competitors was very great, drastically reducing their room for maneuver. "The [vertical] integration had proceeded so far that any significant increase * * * is highly suspect." *Kennecott Copper,* 231 F.Supp. at 105.

(c) *The nature and type of arrangement involved*

Unless stopped by the courts, GTE's in-house dealing is and in the reasonably foreseeable future will remain permanent, just as it has been permanent because it has flowed from permanent acquisitions.[62] Its anti-competitive impact is correspondingly more serious. GTE's assertion that the court must "assume" that GTE's foreclosure occurred from internal expansion is ridiculous; the fact is that it did not.

(d) *The intent and purpose behind the challenged conduct*

GTE claims that its intent in its acquisition and standardization program was to provide quality service at low cost; that there was no intent to foreclose competition, maximize profits, foist inferior equipment, or charge excessive prices; and that in any event *Columbia Steel* validates an

---

**59.** Exhibits B and C, respectively, to Post-Remand Order # 3.

**60.** *See also* this court's finding that Bell as of 1969 controlled 83% of all U.S. telephones. *GTE II* at 1175.

**61.** *See generally Philadelphia Bank,* 374 U.S. at 365 n. 42, 83 S.Ct. 1715; *U. S. v. Continental*

*Can,* 378 U.S. at 461–62, 84 S.Ct. 1738; *U. S. v. Aluminum Co. of America,* 377 U.S. at 279, 84 S.Ct. 1283; *Tampa Electric,* 365 U.S. at 327, 81 S.Ct. 623; *Standard Stations,* 337 U.S. at 299 n. 5, 69 S.Ct. 1051; *U. S. Steel v. FTC* at 600; *Standard Oil* at 212.

**62.** *See* discussion at pp. 1177–1178 *supra.*

intent to assure a manufacturer captive outlets.[63]

GTE's contentions in the face of this court's findings in *GTE II* are, in a word, unbelievable. The court has already found that GTE resisted buying improved equipment if AE or Lenkurt did not manufacture it (*GTE II* at 1192), and has alluded to "excessively high" equipment costs. *Id.* at 1193. One intends the natural consequences of one's acts, and GTE's in-house buying naturally resulted in foreclosure of its share of the equipment market to competitors (*id.* at 1196); *Columbia Steel* permits—or, rather, does not invalidate per se—captive outlets only "until the effect * * * is to unreasonably restrict the opportunities of competitors to market their product." *Columbia Steel*, 334 U.S. at 523–24, 68 S.Ct. at 1122.

The foreclosure here has not resulted from better equipment or better service. *GTE II* at 1189, 1193. GTE's conduct in its in-house dealings manifests an objective to maximize its profits.[64] Maximizing profits and making money are laudable motives in our economy, and indeed are the driving long-term forces underlying competition. GTE's purpose and intent are thus relevant only to deny any countervailing altruistic value to its conduct, and to show that its in-house policy, even if characterized as merely a garden variety of business behavior, nevertheless must be condemned if it unreasonably restrains trade.

(e) *The availability of alternative outlets for foreclosed competitors*

There could hardly be a clearer case of lack of alternative outlets for equipment manufacturers foreclosed by GTE's in-house practice. This is because, on top of GTE's 7.4% of market foreclosure, almost 80% of that relevant equipment market has effectively been foreclosed by the Bell-WE affiliation.

As may be seen from preceding references to the same, this court is most mindful of the Ninth Circuit's admonition "that Bell's purported foreclosure of a large fraction of the telephone equipment market is [not] an immutable fact of market life." *GTE III* at 931. While Bell's foreclosure of its portion of the total market *may* not be "an immutable fact of life," this court is not here to anticipate the future of Bell. This court now and here can only decide this case on the already completed acts of the corporations operating in that market, *i. e.*, on the immutable facts of life as they *have* been and still are manifested therein.

The "immutability" of the Bell connection, while possibly speculatively germane to the assessment of future effect under Clayton 7, is not at all relevant to the evaluation of past impact of an alleged restraint of trade under Sherman 1. The fact is, as this court found (and the court of appeals did not reverse) that almost all of Bell equipment purchases are "captive" purchases, that WE in the most recent relevant years (1968–69) supplied more than 99% of Bell's equipment requirements. This percentage existed even though by the terms of the 1956 Bell Consent Decree WE was required to freely license the manufacture of WE equipment by competitors under its equipment patents (*GTE II* at 1175–76), and even though WE may have lagged in certain research and development areas.[65] It is thus indisputable that, the facial language of the standard Bell operating company-WE contract notwithstanding, Bell's share of the equipment market has been unequivocally reserved to WE and corre-

---

**63.** GTE Brief in Opposition to ITT's § 1 Claim, at 54. Were GTE's intent as it claims, it could hardly object to competition in the equipment market, which could only lead to better equipment and lower costs, if anything. *See* n. 20, *supra.*

**64.** See *GTE II* at 1213; see also 1202 n. 125. This would be consonant with the not unsensible observation that "the integrated manufac-

turer maximizes total profits by maximizing at each level." "Vertical Integration and the Sherman Act," 22 U.Chi.L.Rev. at 181 (1954); *see also* Testimony of Manley R. Irwin, Chief of WE Corp., ATT Task Force, Federal Communications Committee, Dkt. 19129, at 7 (January 17, 1975).

**65.** *See, e. g.,* Testimony of Manley R. Irwin, *supra,* at 24, 70.

**1182**

spondingly foreclosed to competitors. *GTE II* at 1176–77; *GTE III* at 930–31. That the court of appeals somehow concluded the Bell Consent Decree stemming from the 1949 Government suit (see *GTE II* at 1175–76) immunized Bell, if at all, only from Government attack and not from private antitrust action (*GTE III* at 931), in no way alters the *fact* that no action, governmental or private, since the Consent Decree has changed the patent Bell-WE market foreclosure. GTE's assertions that the Bell operating companies are free to buy from whom they please,[66] or that there is no basis to find ATT in-house purchasing,[67] or that WE achieved its Bell "share" on merit alone,[68] border on the frivolous and merit no other comment.

▮ GTE further urges that it should not suffer for its foreclosure of 7.4% just because Bell forecloses an additional "82%."[69] In *GTE II* this court rejected "GTE's plaint is that so long as the giant Bell is allowed to remain vertically integrated, then it is simply 'not fair' to deny like vertical integration to an independent pygmy." 351 F.Supp. at 1183–86. Similarly, this court here rejects the contention that GTE's unreasonable restraints of trade are permissible because Bell's have not yet been condemned. Bell's practices are not in direct issue in this case, and are not here being challenged; GTE's are.

As indicated, this court has adhered to the Ninth Circuit's delphic direction to include Bell purchases in the relevant market. It is moreover obligated by a solid wall of case law [70] to evaluate challenged behavior in the light of the commercial realities of the industry in question.

Perhaps unfortunately for GTE's case, the realities of the telecommunication equipment market *do* include ATT and its captive buyers, and the antitrust violator

takes his market as he finds it actually operating. The realities of *this* market are that something like 90% of it is foreclosed, and that 87% (representing Bell's share of the non-GTE segment of the market) of the appellate-created sales potentials available to would-be equipment sellers to GTE simply do not now exist. Thus GTE by its practices following acquisitions, in market realities has foreclosed not just 7.4% but over 37% of the actual market in which any competition can reasonably be expected to be open (*i. e.*, a market excluding all of Bell's in-house purchases).

The court therefore must and, as indicated above, does find that, in reality, almost all of Bell purchases have been foreclosed in the past and continue to be so foreclosed. This situation severely intensifies the past anti-competitive effect of GTE's 7.4% foreclosure, and brands its in-house behavior as pernicious and an unreasonable restraint of trade. That statement must not be taken even as an inference that a 7.4% foreclosure here would *not* transgress § 1, even if Bell's market share were open.

In short, this is the case described in *Columbia Steel*, where parent-subsidiary dealing unreasonably restricts the opportunities of competitors to market their products. 334 U.S. at 524, 68 S.Ct. 1107. This is a case where "other elements" of Sherman Act violation, namely, undue restrictions on such competitors' opportunities, unreasonable effect on the market, and intent to restrain trade, combine with vertical integration to produce a § 1 violation. *Id.* at 523–25, 68 S.Ct. 1107; *GTE II* at 1217; see *also Manufacturers Hanover* at 887, 927. The 7.4% of the gross market here is well beyond the 3%-and-expected-to-drop figure in *Columbia Steel.* Moreover, the particularistic analysis demanded by that case

---

**66.** Transcript of Hearing August 18, 1976, at 71.

**67.** GTE Brief in Opposition to ITT's § 1 Claim, at 51–52.

**68.** GTE Proposed Findings, # 6.

**69.** Transcript of Hearing, August 18, 1976, at 71.

**70.** *E. g., Columbia Steel*, 334 U.S. at 527–28, 68 S.Ct. 1107; *Chicago Board of Trade*, 246 U.S. at 238, 38 S.Ct. 242. *See also* cases cited in nn. 34, 45, 49–54, 61, all *supra.*

shows "the setting in which that [percentage] factor is placed" (334 U.S. at 528, 68 S.Ct. at 1124) to be one which condemns the challenged behavior of GTE.

**(f)** *The introduction of an "irrelevant and alien factor" into free choice among competing products in a given market*

The General System telephone operating companies have no free choice among competing equipment manufacturers. *GTE II* at 1188–93. They buy AE/Lenkurt if AE/Lenkurt makes it, and almost not at all if AE/Lenkurt doesn't. *Ibid.* This state of affairs is due solely to the vertical integration of GTE, which in turn is an "irrelevant and alien factor" in purchasing decisions (or lack thereof) and which in fact totally distorts them. *See* note 53, *supra.* The same statements apply to Bell and its 82% of the gross market.

**(g)** *Entry barriers in the affected market*

Large-scale entry into the telecommunications equipment manufacturing market is well nigh impossible, precisely for the reason that increasingly there are fewer uncontrolled buyers; vertical integration has sewn up most of the relevant (here, national) market. An enquiry here into the entry barriers in the telephone operating market, with an eye to new customers for manufacturers, discloses that entry *is* impossible! The United States is fully blanketed with franchised telephone operating monopolies, a situation which admits of no *additional* entrants. Not only does this deprive equipment manufacturers such as ITT of alternative sales, it also removes the possibility of any competitive, as opposed to regulatory,

pressure on GTE to loosen up its purchasing practices.[71]

**(h)** *The degree of market leverage, if any, possessed by the foreclosing entity*

Perhaps the single most alarming aspect of GTE's vertical integration and resultant in-house dealing is the use of its monopoly leverage in the telephone operating market to foreclose competition in the telecommunications equipment industry, an area that has *not* been entrusted to it by franchise and that is *not* regulated. In short, GTE (and not alone) has betrayed its public trust in operating a public utility by misusing its power to destroy competition in another economic area and violate the national economic freedoms embodied in the antitrust laws. Such practice must be condemned,[72] even more than the use of leverage from an *earned,* rather than government-granted, monopoly, which still can violate the Sherman Act.[73] This type of anti-competitive restraint cannot be permitted to continue, let alone increase.

## CONCLUSIONS OF LAW

GTE and its affiliates, including Automatic Electric Co., Lenkurt Electric Co., GTE Service Corp. and all of GTE's U. S. telephone operating companies, not named as defendants, conspiring together and acting in concert, by acquiring Theodore Gary and Company, Automatic Electric and Lenkurt, and subsequently and successively acquiring numerous telephone operating companies, and by developing, effecting and enforcing an in-house purchasing policy through which the telecommunication equipment requirements of the Gen-

---

**71.** As the stipulated percentages indicate, the sales of telecommunications equipment outside of the telephone industry account for but 0.5% (*see* n. 39 *supra*) of the total telecommunications equipment market as outlined by *GTE III,* indicating, if indeed not in reality, a *de minimus* element in the market.

**72.** For other examples *see Mt. Hood Stages* at 696 n. 22; *Otter Tail,* 410 U.S. at 377, 93 S.Ct. 1022; *Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc.,* 365 F.2d 478, 483 (5th Cir. 1966); *Packaged Programs, Inc. v. West-*

*inghouse Broadcasting Co.,* 255 F.2d 708, 710 (3rd Cir. 1958).

**73.** *Greyhound Computer v. Intern. Business Machines,* 559 F.2d 488, 503 (9th Cir. 1977); *United States v. Klearflax Linen Looms,* 63 F.Supp. 32, 39 (D.Minn.1945); *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

eral System funneled into and purchased from AE and Lenkurt, have combined and conspired to effect and have brought about an actual and unreasonable restraint of trade in the telecommunications equipment market in violation of § 1 of the Sherman Act.

As indicated heretofore, this conclusion is reached whether this court assumes that purchases by the Bell System operating companies are to be included in the appellate-created relevant market or assumes that Bell purchases are to be excluded from the relevant market.

### RELIEF

Pursuant to Post-Remand Order # 3, ¶ 1, and Post-Remand Order # 1, ¶ 1, an evidentiary hearing on the issue of relief will be held. In submitting proposals for relief the parties may consider the court of appeals' denial of divestiture as a § 16 private remedy in *GTE III* at 920 as well as its pronunciamentos in *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674, 694 (9 Cir. 1976).

### APPENDIX A

### FINDINGS OF FACT

*I. Parties*

1. ITT is a Delaware corporation, a conglomerate industrial colossus, engaged in a wide variety of business in the U.S. and abroad. Through its telecommunications division, ITT Kellogg, it manufacturers, distributes and sells telephone equipment, components and supplies in U.S. and foreign commerce.

2. ITT is second only to WE, on a worldwide scale, in the manufacture of telephone equipment, having 67 telephone equipment factories in 30 foreign countries and 5 similar plants in the U.S. It also has a wire and cable plant in San Diego. As of 1969, it owned and operated approximately 300,000 telephones in Puerto Rico and the Virgin Islands. It has been a vertically integrated telephone company since 1925, when, while operating Ricotelco, it acquired Internation-

al Western Electric from WE. It commenced the manufacture of telephone equipment in the U.S. after 1940. It acquired Kellogg Switchboard & Supply Co. in 1951 and consolidated its manufacturing divisions under the name of ITT Kellogg.

3. Although prior to the 1960's it had large interests in foreign telephone operating companies, in recent years ITT, both voluntarily and through expropriation, has disposed of substantially all its telephone companies outside the U.S. Now, certainly in the U.S. and Canada communications markets, it can fairly be characterized primarily as a telecommunications manufacturing company with telephone operations being a relatively minor segment of its business.

4. GTE, a New York corporation, as a holding company, owns and controls 33 telephone operating companies in 34 states of the U.S., serving, in 1969, 9,146,000 telephones, and another three operating companies in Canada and the Dominican Republic, serving, in 1969, 1,157,000 telephones. GTE wholly owns AE, which in turn owns Lenkurt and operates five telephone equipment manufacturing plants in the U.S. GTE also owns and operates GTE Laboratories, Inc. (GTE Laboratories), a telephone equipment research facility. It also owns GTE Service Corporation (GTE Service); General Telephone Directory Company (GT Directory); General Telephone Credit Company, Inc. (GT Credit); GTE Communications, Inc. (GTE Communications); GTE Data Service Corporation (GTE Data); Sylvania; and GTE International, Inc. (GTE International). GTE has a total of 116 manufacturing plants throughout the world (including the U.S.). GTE is the successor to General Telephone Company (General), which was formed in 1935 to operate as a holding company for telephone operating companies.

5. Hawaiian, a Hawaii corporation, now a wholly-owned subsidiary of GTE, is a telephone operating company providing statewide telephone and communication services among the islands of the state of Hawaii and between Hawaii and other

states, as well as foreign countries. (It is the only GTE subsidiary named as a party to this case.)

6. AE is GTE's developing, manufacturing, supply and distributing company for telecommunication transmission equipment. It manufactures a substantially complete line of such equipment (AE does not manufacture wire or cable), and is the second largest manufacturer thereof in the U.S. (WE is first), with annual (as of 1969) sales of $180 million of switch gear, $59 million of station apparatus, $33 million of other equipment. In 1969, it distributed $196 million of telecommunication supplies not manufactured by it. The non-Bell, i. e., independent, telephone companies purchase most of their equipment from AE.

7. Lenkurt, an AE subsidiary, is a leading producer of video, voice and data transmission equipment for the communications, industrial and government markets.

8. Sylvania manufactures a variety of electrical products including specialized electronic equipment for various fields other than the telecommunications industry. Although at acquisition GTE expected Sylvania's organization to augment AE's research and development in the field of electronic telecommunications, this never occurred. As of 1971, Sylvania was manufacturing nothing for the telecommunications industry, per se.

II. *The Telephone Industry*

9. The "Bell System" means the American Telephone and Telegraph Company (ATT) and Western Electric Company, Incorporated (WE), and their subsidiaries, and the Bell Telephone (Bell) operating companies. Bell blankets the U.S. and the number of telephones owned and operated by ATT in the U.S. has jumped from 14,280,000 in 1935 to 95,942,200 in 1969.

10. The number of telephones in the U.S. in 1935 was 17,465,000, of which 3,185,000 (18%) were operated by independent

telephone companies. At that time General owned and operated 381,000 telephones, i. e., 2.2% of the total in the U.S. or 12% of the independents' telephones. By 1969 there were 115,501,000 telephones in the U.S., of which 19,559,000 (17%) were operated by independents. Of these GTE owned 9,022,000, i. e., 7.8% of the total U.S. telephones or 46% of the independents (see Subappendix 1).

11. The total gross operating revenue of telephone companies or systems in the U.S. in 1935 was $1,042,000,000, of which $95,000,000 went into the coffers of the independents. Bell took the rest. General's share of the independents' revenue was then 12%. In 1969 the national total gross operating revenue from telephones was $18,672,000,000, of which $2,614,000,000 was generated by the independents. GTE's portion of the total revenues was 6.9% and 49% of the independents' revenue (see Subappendix 2).

12. The total gross plant investment of telephone companies or systems in 1935 was $4,805,000,000, of which the independents had a $596,000,000 investment, and General's investment was 11% thereof. By 1969 the total gross plant investment was $61,919,000,000, of which the independents had $11,393,000,000. GTE's plant investment was $5,357,000,000 or 8.7% of total United States plant investment and 47% of the independents' total investment (see Subappendix 3).

13. In 1935 there were 6,627 telephone operating companies in the U.S. Bell had 24 of those and 13 were in the General system. By 1969 the number of telephone operating companies had shrunk to 1,919, 25 of which were Bell and 33 GTE (see Subappendix 4), and out of 1,894 *independent* telephone operating companies, the top 25 controlled 81.2% of all independent telephones. The top six of these were as follows:

| | | Tele-phones | % of Independ-ent Market |
|---|---|---|---|
| 1. | GTE | 9,022,400 | 46.13% |
| 2. | United | 2,233,100 | 11.42 |
| 3. | Continental Tel. Corp. | 1,248,800 | 6.39 |
| 4. | Central Telephone Utilities Corp. | 895,900 | 4.58 |
| 5. | Mid-Continent Tel. Corp. | 496,200 | 2.54 |
| 6. | Rochester Tel. Corp. | 494,200 | 2.53 |
| | TOTAL | | 73.59% |

14. As indicated above, United is the third largest telephone operating company in the U.S. In 1967, it acquired some nine telephone operating companies with over 500,000 telephones. In 1966 United bought controlling interest in North Electric Company (North Electric) and in 1967 acquired the balance to make it a wholly-owned subsidiary. North Electric manufactures and installs telephone equipment for central office exchanges, including crossbar telephone switchboards and allied products. It also manufactures and installs small telephone switchboards for use in offices and factories. North Electric has contractual and patent licensing arrangements with the L. M. Ericsson Telephone Company of Sweden, a large international manufacturer of telecommunications equipment.

15. Continental is the fourth largest. As of the end of 1969 its subsidiaries served approximately 1,492,000 telephones in 42 states, Canada and five Caribbean countries, and at the same time was in the process of acquiring 35,000 additional telephones. One of its subsidiaries, Superior Continental Corporation manufactures wire and cable and auxiliary equipment. Other subsidiaries publish telephone directories, render data service, etc.

16. In 1970 Mid-Continent Telephone Corp. purchased Buckeye Telephone & Supply Company of Columbus, Ohio, a distributor of equipment and supplies to independent telephone companies. Buckeye's sales for the period ending April 30, 1970 were $5.3 million.

17. In 1949 General owned some 1,187,-000 telephones but it was vertically inte-grated only in a *de minimis* way.[1] In 1950, however, it acquired Leich, which manufactured switching equipment and also was a distributor of telecommunications equipment. At the end of 1962 Leich was merged into AE. General did not "go big", vertically, until October 1955 when, by acquiring Theodore Gary and Company, it not only added almost 600,000 telephones to its systems (in 1954 it had 1,804,000 telephones), but it also brought to General a 78% interest in AE. Subsequently, GTE acquired the remaining 22%, making AE 100% owned by GTE. In 1955, AE was admittedly "the largest producer of communications equipment for the independent telephone industry." At that time, AE owned a one-third interest in Lenkurt, a manufacturer of electronic transmission equipment, and was Lenkurt's exclusive distributor. In 1959 the balance of the Lenkurt stock was acquired by GTE.

18. By its acquisition of the Theodore Gary properties, GTE thus became not only a fully integrated telephone company but it also became the largest telephone operating company of all the independents and, as indicated above, had acquired control of the second largest telecommunications manufacturing company in the U.S., the major supplier to non-Bell companies.

19. In 1959 GTE acquired Sylvania, and at this time General Telephone Company changed its name to General Telephone & Electronics Corporation. In 1962 GTE acquired Panhandle Electric, another manufacturer of transmission equipment and made it an AE division.

20. When, in 1967, this suit was brought by ITT, approximately 48 telephone equipment manufacturing companies supplied the entire telecommunications industry in the U.S.

III. *Lines of Commerce*

21. From its inception, telephone service in the U.S. has been conceived as voice

---

1. In 1937 General acquired one-sixth of the stock of North Electric. General sold that interest in 1953.

communication between distant points through telephone instruments. Recently this "service" has become involved with other forms of communications, including data transmission. In the U.S. communications systems utilizing "telephone equipment" are principally operated by the telephone operating companies heretofore listed. However, similar communications systems are used by some industrial and other commercial enterprises as well as some federal, state and local government units.

22. In any such communications systems, the most important types of equipment are apparatus, switching equipment and transmission equipment. In the telephone operating company systems "apparatus" consists of the telephone itself and such other items of equipment usually located on the premises of the user. "Switching equipment" interconnects the line and telephone of one user with lines and telephones of other users.

23. Switching equipment includes, without limitation, central office equipment, switches, relays and selectors. There are, of course, two types of switching equipment: central office equipment and private branch exchange equipment (PBX). (An automatic PBX is called a PABX.) Central office equipment interconnects the line of one subscriber with the lines of other subscribers connected to the central office of the telephone operating company or with the toll switching network. Toll switching systems interconnect local central office switching systems with other toll offices. The central office serves as the switching network to connect telephones for local calling purposes as well as to connect that central office with the toll switching point. The toll network is a national-wide toll network in which all telephone operating companies participate.

24. Any industrial and commercial enterprise, federal, state and local government units operating "communications systems", if they wish to communicate outside of their own limited, "internal" system, must use the telephone operating companies' systems and toll network. For example, PBX or PABX equipment while connecting the telephones on the subscriber's premises with each other, must have some sort of interconnect with an outside central office exchange of a telephone operating company.

25. Transmission equipment is used for transmitting electrical impulses from point to point. Traditionally, from the time that Bell first used a wire for that purpose, wire or cable has been the equipment used in a telephone system for transmitting those electrical impulses necessary to carry the voice from point to point. Of recent years, however, microwave radio has been added to the transmission equipment field.

26. The principal companies engaged in the manufacture of a relatively full line of telecommunications equipment for sale to telephone operating companies in the U.S. are: Western Electric Company, Automatic Electric (including its subsidiary Lenkurt), Stromberg-Carlson Corp., North Electric Co., and ITT.

27. Northern Electric of Canada distributes its version of Western Electric type # 5 Cross-Bar switching equipment through Stromberg-Carlson, and minor amounts of subscriber apparatus through Graybar Electric. Lenkurt and Collins provide the major portion of transmission equipment sold to the independent telephone operating companies. Neither AE nor Lenkurt manufactures wire or cable. ITT does, as does WE.

28. This court previously found that the product market consists of sales of apparatus, switching equipment and transmission equipment and that it does not include wire and cable, and that the geographic market is the entire United States. These findings were affirmed by the Court of Appeals.

29. It is unclear to this court whether it is to exclude purchases made by Bell System operating companies from WE from the relevant market in considering ITT's Sherman Act claim. The appellate opinion, which speaks in terms of future changes in market structure, appears to have been dealing with ITT's claim under Section 7 of the Clayton Act rather than ITT's Sherman

Act claim in which ITT contends that an unreasonable restraint of trade was previously effected. Accordingly, the exclusion of Bell System purchases from WE when the court assesses ITT's Sherman Act claim may be proper. The court will assess ITT's Sherman Act claim both in a customer market in which Bell System purchases are included and also in one in which they are excluded. In both cases, the court will of course include purchases by government and industry customers as mandated by the Ninth Circuit.

30. Even if Bell System operating companies do not constitute part of the customer market, certain findings which the court previously made with respect to Bell System purchasing practices which led it to exclude Bell System operating companies from the customer market in its previous opinion are relevant in assessing the impact of GTE's in-house purchasing practices on unaffiliated telephone equipment manufacturers.

31. For the years 1955 through 1969 the sales to the Bell System [by] ITT, North Electric, Collins, Stromberg-Carlson, GTE, Farinon, Lynch and General Electric were some $12 to $16 million per year. During the same period, Motorola's sales to WE (principally mobile telephone equipment) averaged about $10 million per year. These sales, *per se*, do appear quantitatively not insignificant, when not evaluated against the *total* purchases of Bell. In 1968 and 1969 Bell System purchases of telephone equipment from independent manufacturers was only 0.89% and 0.83% of its total purchases. It thus appears that WE supplies 99 + % of all telephonic equipment to the Bell System, leaving only crumbs for the independent manufacturers.

32. Superficially, even in the face of this factual picture, it might be (and, by GTE is) argued that the Bell System market is wide open because the Standard Supply Contract in effect between WE and each Bell operating company, while providing, Art. 1, Para. 1, that WE will fill all orders from a Bell telephone company, then specifically adds that the latter is not obligated to purchase any materials from WE.[2] When one sees that *without obligation* WE is nevertheless called upon to supply over 99% of the Bell System requirements, it can only be concluded that the words of the Bell-WE contract are wonderful to look upon but in market implementation they have no more reality than a western movie set. It was manifest from the evidence that Bell purchased from independent manufacturers only to fill the peaks and windows of its demands, i. e., if WE didn't make it or didn't have it, and felt it could use it, then Bell, i. e., WE and the Bell System telephone companies, would buy it from independents—until such time as WE produced it. Thereupon the Bell System no longer would buy it from the independent.

33. Admittedly, ITT and every other independent manufacturer is desirous of selling to Bell whenever possible. The appetite of the Bell giant for telecommunications products is so great that even the crumbs which fall from its board are large enough to be savory morsels for the independents. It is equally evident from the evidence, however, that these same morsels cannot be expected to be annual and competitively open fare for the independent manufacturers. The Bell "market" is available only so long as WE does not decide to consume all of its business itself.

34. In *United States v. General Telephone & Electronics*, Civil No. 64–1912,[3] GTE alleged in its answer to the government's complaint:

"A result of the Bell System Consent Decree has been the foreclosure of that portion of the market for telephone equipment consisting of the Bell System telephone operating companies from competition by telephone equipment manufacturers other than Western Electric because the Bell System telephone operating companies purchase all their equipment and supplies from Western Electric." ITT Trial Brief, 50.

---

2. Fletcher Ans. 16.1, 16.5.

3. See reference to this 1964 government action, *infra*.

35. In 1968, General Telephone Company of California, one of GTE's major subsidiaries, at a California PUC hearing, placed into evidence the expert testimony of Professor Jules Backman, economist from New York University:

"Q. Now, looking to the market for telephone equipment manufacturers, do you consider Bell System part of the market?

"A. As a practical matter, it is not in terms of its availability as a buyer, although there may be some small things that are bought."

## IV. GTE Telephone Acquisitions and Their Market Impact

36. Prior to 1955, GTE had acquired by acquisition only some 240,000 telephones—3% of the 1954 U.S. independent *total*. By 1967, however, GTE *by acquisition alone*, had acquired control over an *additional* 2,255,626 telephones—over 13% of the 1967 U.S. independent *total*.[4] In the same corresponding periods, GTE owned 1,804,000 telephones in the U.S., in 1954—3.4% of total U.S. or 23% of the U.S. independents. By the end of 1967 it owned 7,729,000 telephones in the U.S.—7.4% of total U.S. or 45% of the U.S. independent telephones. By 1969 GTE owned 9,022,000—7.8% of the total U.S. or 46% of the independents.[5]

37. The total number of telephone operating companies in the U.S., including Bell's 23 and GTE's 16, was 4,984 in 1954. By 1969 this had decreased to 1,919, including Bell's 25 and GTE's 33—through horizontal acquisitions.

38. Bell made no acquisitions during this period. It simply restructured its own organization. GTE made a multitude of acquisitions and restructured its acquired companies into its own system companies.

39. It is obvious from the above that as the number of independent companies has shrunken, control over the purchasing power of the 3,000 companies that have disappeared has been concentrated in their several acquired. During the above period GTE has far outstripped all other independents in eliminating, via the acquisition route, the number of potential buyers in the industry.

## V. Effects of GTE's In-House Purchasing Practices

40. Various officers of GTE, including its then president, Mr. Warner, have testified that GTE operating companies buy the best equipment at the best prices regardless of source and that each of its operating companies makes its own purchasing decisions without exercising any discretion in favor of in-house purchasing. GTE would have this court believe that General System fully opens its markets to all manufacturers of telecommunications equipment.[6]

41. The record of GTE prior to the bringing of this suit, however, makes it clear that in practice, regardless of such verbalization, when an independent telephone operating company has been acquired, all the independent manufacturers and suppliers, save AE and Lenkurt, have thereafter found their sales to the acquired company to have abruptly declined.

42. The sales figures and charts of Graybar verify the statement of Robert B. Thompson, General Communications Sales Manager of Graybar Electric, whose principal customers are the independent telephone companies, that in almost every case there was an abrupt decline in the volume of its sales to an operating telephone company after such company was acquired by GTE.[7] As Thompson also pointed out,

---

4. GTE Vol. III, Interr. & Stips., PX E, F.

5. *Id.*, PX F.

6. It is insurmountably difficult for this court to reconcile the above contentions with GTE's position that vertical integration is necessary in the telephone industry in order to obtain the benefits of equipment standardization and co-operative research and development.

7. Thompson Dep., pp. 53–56.

Graybar was able to sell to GTE operating companies transmission equipment types not made by Lenkurt, e. g., WE type "O", "N" and "T" carriers, but when Lenkurt began to manufacture the "N" and "T" type carriers, Graybar sales of this equipment to GTE companies substantially decreased.[8] Of similar import was the testimony of Kerry R. Fox, Asst. Vice President of Marketing of Collins Radio, whose bookings to GTE in microwave and multiplex equipment declined from over $½ million in 1965 to $80 thousand in 1967 as Lenkurt came on stream. Similarly illustrative were Collins' sales to Western Utilities, which were over $¼ million in 1964, but after Western Utilities was acquired by GTE in the summer of 1964, Collins' sales to Western Utilities dropped to $1,600 in 1965.

43. Similarly, North Electric sales to West Coast Telephone of common control crossbar equipment came to an abrupt halt after West Coast was acquired by GTE.[9] Prior to its acquisition by GTE, Peninsular Telephone purchased approximately 90% of its telephone instrument requirements from Stromberg-Carlson. Immediately after acquisition, GTE switched to AE telephone instruments.[10] ITT's sales to Peninsular also dropped from $67,000 in 1957 to $4,000 in 1958 and 0 in 1959–60.[11]

44. GTE has "standardized" all AE's telephone apparatus and its operating companies purchase substantially all of their requirements for telephone apparatus from AE. Since 1960 GTE has installed AE's switching equipment in approximately 95% of all new and replacement central offices. Lenkurt's share of GTE System purchases of transmission equipment has been as follows:

LENKURT'S MARKET SHARE
OF GTE SYSTEM PURCHASES

| Year | Percent of General Companies Purchases |
|------|------------------|
| 1965 ................ | 97% |
| 1966 ................ | 98% |
| 1967 ................ | 94% |
| 1968 ................ | 97% [12] |

By contrast, during those same years, Lenkurt's share of the market of other independents plus Bell available, dropped from 55% to 35%.[13]

45. That this foreclosure does not result from simply "better equipment, better service," etc., is shown conclusively by the pre-complaint statements of GTE's executives of various rank. For example, Robert M. Wopat, who in February 1963 was Executive Vice President-Telephone Operations for the GTE Service Corporation, wrote to all operating vice presidents with copies to all chief engineers, plant directors and controllers (all those responsible for purchasing) that the operating companies did *not* have the option of arbitrarily deciding or specifying on orders what they individually considered to be items which would be equal to the items included in the System Standard Material List. Only AE and Service Corporation had that power. (PX 100)

46. Also C. W. Schwob of AE noted in November 1967 (PX 131):

"The management of the Service Corporation has very strong feelings re the operating companies ordering non-standard material when standard [AE] materials are available."

And George H. Gage, Vice President-Telephone Operations Staff, in a letter to R. J. Gressens, President of AE, on January 30, 1968 (PX 133), stated in effect that AE was to supply a non-System standard item only if it had been reviewed as to performance and quality by the Service Corporation. If

8. *Id.*, pp. 39–40, 45–48.

9. Beck Dep. p. 9; GTE Ans. to ITT's Interrog. 2, dated March 18, 1970.

10. Darlington Dep. pp. 15–17, 28–30.

11. ITT's Ans. to GTE's Domestic Interrog. 39.5, dated November 15, 1968.

12. PX 41, 45.

13. PX 358.

the purchase order did not indicate that the item desired was non-System standard, then AE was to advise the operating company of the standard item that was available. In 1967, the same George Gage wrote to the operating vice presidents of the General System (PX 120):

"No engineering efforts other than those associated with a 'paper investigation' should be expended, nor should any commitments be made with any supplier and/or manufacturer regarding new products until approved by the GTE Service Corporation. In this manner we can all pull on the same team and minimize evaluation and field trial expenses.

"Over the past few years we have felt a great deal of pressure from the Bell System operating companies to establish jointly-operated T–1 carrier systems. Such efforts should be resisted or delayed until such time that a General System Standard is available * * *.

"Recently, we have also felt pressure from some independent telephone operating companies to use the products of two manufacturers, which they state are compatible on an end-to-end basis with the Western Electric T–1, on jointly operated interconnected routes. Here again, such efforts should be resisted or delayed until a General System Standard is available. There are solutions to these problems such as the utilization of the 81A and 47 carrier systems. * * *

"While this letter deals specifically with the T–1 carrier situation, it should also be taken more generally to be applicable to all nonstandard items of equipment (central office, radio/microwave, outside plant, etc.). Bulletin AD-y is being revised to state more clearly the System policy. Our engineering Department here in New York is coordinating our standardization activities and should be contacted if there are any questions regarding the System rating of any items. Please take any action deemed necessary to implement this policy in your company."

47. When the policies concerning control of non-System standard purchases became firmly established and known, it is noted that at lower echelons "the facts of life" were well understood. In mid-1964 Jack A. White, GTE Service Corporation Materials and Supply Procedures Director, wrote to C. C. Lillig of AE concerning the treatment of nonstandard material items in the new mechanized billing procedures (PX 102):

"Our basic ideas behind the 'XX9999' number for non-standard materials are, first to attract attention to the number of such items and the frequency with which they are ordered, and second to deprive them of the convenience and smooth flow associated with standard materials. You probably remember Bob's facetious suggestion that all orders for non-standard material automatically go to a suspense file for thirty days before they are even entered."

48. The attitude which was inculcated into the GTE organization is aptly though facetiously illustrated by PX 139:

"PX 139 is a memorandum addressed from 'Fred' to Carl Schwob, Northlake office of Automatic Electric, enclosing a set of instructions for ordering supplies for General Telephone of Florida. The first page of those instructions states that the instructions for ordering non-standard materials per Section 05–99 are considered self-explanatory. 'Fred' commented humorously on those instructions as follows:

'I like the last two pages of this section (05–99). He lists all non-standard materials and illustrated the ease of ordering them. This came from his last flight on Northwest Air Lines. It illustrates what a deep thinker Russ really is. They don't come any better.' "

Page one of Section 05–99 of the referenced Supply practices states as follows in its entirety:

"99.1 The exhibit attached covers instructions for ordering non-standard items."

(Below is a reproduction of Exhibit 1 in Section 05–99, entitled "Instructions for Ordering Non-Standard Items".) [14]

### INSTRUCTIONS FOR ORDERING NON-STANDARD ITEMS

乗客の皆さまの安全確保のための緊急重要事項

米国連邦航空局の指令により，乗客の皆さまは緊急着陸の際，速やかに航空機から脱出する方法をあらかじめご承知おきください。このパンフレットの中には，この航空機の平面図がございます。そこには脱出口と，その開け方が明示してあります。脱出なさる時は，あなたの座席から一番近い脱出口へ直行してください。決してご自分の持物などをとるために立ち止まらないでください。

着陸の際には，座席についているテーブルはすべて元の位置におさめ，座席の背はまっすぐに立てておいてください。

座席ベルトについてのご注意：上空を飛行中たまたま機体がはげしく振動することがあります。座席ベルトをしめるサイン・ランプが点灯しましたら，ベルトをしっかりしめてください。

비상시 알아두어야할 중요한 사항

여러분의 안전을 위하여— 연방항공국은 비상착륙시 승객이 신속히 비행기로부터 탈출하는 방법을 알고 계시도록 요구하고 있습니다. 본책자에는 여러분이 타고계시는 비행기의 정면도가 있으며 탈구의 위치 및 여는 방법도 설명이 되어있읍니다. 비상탈출시에는 여러분의 가장 가까운 탈구로 가십시오. 개인 소용물을 찾으시기 위하여 멈추지 마십시오.

연방항공국은 비행기 가착륙시 좌석앞에있는 탁상은 제자리에 그리고 작석등받이는 정상적인 위치에 두도록 요구하고 있읍니다.

여러분의 좌석혁대에 관하여— 흔한일은않으나 고공에서 저칠은 기류를 맞나 심한 동요를 이르킬때가 있읍니다. 경고 신호가 켜지면 혁대를 단단히 매어 주십시오.

應付緊急意外須知為閣下安全起見「民航聯會」

促請及乘客然習緊急脫機辦法，以便萬一遇緊急降落時，得以迅速脫離機艙。本小冊內印有所乘座機之平面圖，指示緊急出口所在，及其開啟方法。如遇緊急意外，請即走向最近之緊急出口，切勿因顧及私人物件，致誤時機。

降又在起飛及降落時，必須收起座枱，及將座背存持直立。

回於使用安全帶：在高空飛行中遇至氣流時，机身會有放烈搖動。如見安全帶信号灯点亮，請即將安全帶一扣緊。

---

49. As Mr. Rothe, counsel for GTE, admitted in oral argument on GTE's motion to join ATT (Bell) as a defendant in this case:

"The very essence of vertical integration implies—and this has always been recog-

14. The various ideograms actually describe in Japanese, Korean and Chinese, proper disembarkation procedures in the event of an un-scheduled landing in the Pacific Ocean and is to be found at *GTE II* p. 1191.

nized—that there is an in-house purchasing. This is not denied."

This statement was confirmed by Herbert F. Lello, then President of AE and subsequently Executive Vice President-Manufacturing for GTE Service Corporation, in testifying during GTE's 1961 rate case hearings before the New York State Public Service Commission (PX 9):

"Q. From what you have told me, I take it that it is and always has been the policy of the GT&E System that its domestic telephone companies should purchase all of the requirements of equipment and supplies from Automatic and Leich where it is possible to do so?

"A. That's correct where suitable equipment is available."

50. The record is loaded with testimony and instances unquestionably indicating that when AE (Lenkurt) makes it, products made by a competitor do not become standard-System items, and there "aren't very many" standardized items of non-affiliated manufacturers on the System-approved list.[15]

51. GTE also has a policy of resistance to introduction into the General System of improved equipment until AE or Lenkurt makes it. While this court does not feel it is necessary to engage in a minute detailed analysis of the relative technical merits of step-by-step switching systems with common control crossbar switching systems, nevertheless the court is satisfied that as AE has never manufactured a common control crossbar system as has North Electric, Stromberg-Carlson and ITT since 1956, General has continued to install the apparently less efficient step-by-step equipment into nearly all new and replacement central offices since that time, because (a) it had a tremendous investment in its step-by-step manufacturing facilities; (b) as indicated above, it does not propose to admit sales of competitive control crossbar switching systems into its telephone operating companies; and (c) it hoped to leapfrog (as it has done), regardless of the time and efficiency

lag, into development of an electronic switching system.

52. This same policy to resist buying other than in-house is shown in the development of the sophisticated PCM (Pulse Code Modulation) carrier systems. The Bell System was installing a WE PCM carrier in 1962. By 1965 Vicom had developed an equivalent thereto. Lynch also developed an equivalent carrier. Lenkurt had not. When it became apparent to GTE that they would possibly be forced by service requirements to purchase an equivalent PCM carrier, even though Lenkurt had not developed one, on October 22, 1963, I. B. Jackson, Engineering Director of GTE Service, wrote to Lenkurt concerning the PCM carrier (PX 224):

"If possible, it would be well to try to hold the line [against purchasing WE's, Vicom's or Lynch's PCM carrier] to some degree by having the Lenkurt version in time to avoid the Lynch version * *."

53. When Lenkurt still had not produced a PCM carrier, on August 30, 1967, C. E. Munsell, Engineering Director of GTE Service, wrote all operating company chief engineers that Service was just then conducting its field trial of a Lynch PCM carrier because

"we can not delay the construction program for * * * PCM carrier systems and * * * it will be necessary to purchase * * * outside the System."

He then continued:

"Hopefully, we will be able to hold such non-System purchases to an absolute minimum, until such time as an approved System Standard [i. e., Lenkurt] makes the same available." (PX 225, 229)

54. That policy was also maintained for dial-in-handset telephones (PX 168–172), as well as for tel-touch equipment which was introduced by ITT in 1965. Even though Gentel of the Southwest, without notifying GTE Service, tested and approved ITT's

**15.** Clerkin Dep., p. 21.

tel-touch, and the Bell System had standardized on it, Service recommended against purchase because AE was working on, and in 1969 released, comparable equipment.

55. As hereinabove set out, as a result of GTE's in-house buying policy and resistance to competitors' products, substantially all of the telecommunication equipment requirements of General companies have been purchased from AE.[16]

56. Thus, the evidence would indicate that while this combination of restraint of competition and internal research and development may have benefited GTE, there is evidence that it may not have benefited the GTE subscribers, and it certainly has not benefited the general economic health of the independent telephone equipment manufacturing industry.

57. In this connection, while not necessary for the determination of the issues here, the court notes that the California Public Service Commission, after exhaustive investigation into the policy and purchasing practice of Gentel of California and AE, concluded that the prices charged by AE to Gentel were but the same as those charged by independent manufacturers for the equivalent equipment. AE gave no discounts to Gentel because of quantity purchases or because it had lower sales expenses. It did not even attempt to approximate the lower prices charged by WE to Bell companies for equivalent equipment. The conclusion of the California PSC was that the prices paid were excessive and unreasonably high. Although GTE has protested this conclusion, it does not deny the accuracy of the finding as to the underlying facts. It appears that AE prefers to sell its equipment to GTE's operating companies at list price, i. e., meeting the like list prices, etc., of independent manufacturing competitors rather than granting any volume discounts such as normally are given to those independent telephone holding companies with supply organizations.[17]

58. ITT has proved that AE (Lenkurt) manufactures a complete line of telecommunications equipment and is utilized by GTE to fulfill all of the basic requirements of the General System operating companies. AE (Lenkurt) possesses the financial, technical and productive resources, i. e., plants, necessary for reasonable expansion in the future to enable it to make the quantities and types of products demanded by GTE's affiliated operating companies.[18] Whenever AE or Lenkurt develops a new product, such as its new electronic switching system (Electronic Automatic Exchange, i. e., No. 1 EAX), an in-house testing and subsequently in-house purchasing of its products is assured. It is equally assured that its products will be purchased by the affiliated companies over any possibly competing product, even if that product is more than equally efficient.[19] Competing manufacturers have found their sales in the relevant market to have been curtailed, even to the point of complete elimination in some instances, as a result of the successive acquisitions.

59. The General System policy of "standardizing" on AE (Lenkurt) products and resistance to use of non in-house equipment effectively forecloses competing manufacturers from selling competing products to the General System.

60. It is clear that GTE undertook its acquisition program in order to obtain additional customers for its telephone equipment, and correlatively, to deprive other sellers of telephone equipment of the opportunity which they previously enjoyed of vying with AE and Lenkurt for the opportunity to supply the needs of these customers. As GTE's then President and Chief Executive Officer, Warner, in his address of

16. Warner, Tr. 687–88, 799–800, 807–10.

17. Wandrey, Tr. 400–02; Woodruff, Tr. 156; PX 1, p. 53.

18. GTE Vol. III, Interr. & Stips., ITT Item 7, PX 2.

19. Warner, Tr. 690–93, 695–96, 699, 895.

December 2, 1966 [20] to 300 top management personnel of Gentel of Florida explained:

"I'm sure that most of you are familiar with the modest, small beginnings of what we call the General System. * *

"We had no manufacturing, and back in 1950 the total sales of the General System were $70 million dollars, and their net income was $4,100,000. * * * [W]e closed out last year [1965] with sales of 2 billion and 36 million dollars. That ranked us number 25th in sales of all of the companies in America. Our net income was 167 million, which ranked us number 18. At the end of last year we had 3½ billion dollars invested in plant and equipment on the combined telephone and manufacturing side, which ranked us number 10. * * *

"This year we're anticipating $2 billion, 400 million. * * * Our net income this year, we anticipate, will be $200 million dollars compared to the 167 which we made last year. * * *

"About half of our operations are in telephone companies that serve about 75 hundred communities in 32 states and this year will contribute a billion dollars to our total revenues. The other half, more or less, comes from this gigantic manufacturing complex that we've built up since 1950, which this year will contribute a billion, 400 million dollars to our total. * * *

"Automatic has grown and developed to the point where it has been, for a number of years, the largest supplier of communications equipment to the non-Bell sector. Another subsidiary company, Lenkurt Electric, is, as you know, a specialist in microwave radio, multiplexing equipment, data transmission and receiving systems, telemetering equipment, and things of that nature. The sales of these two domestic communications equipment manufacturing companies this year will reach about four hundred and fifty million dollars.

*　　*　　*　　*　　*　　*

"How did we get here? * * * [T]hrough a great deal of internal growth * * *. [O]ur internal growth on the telephone side is presently running at the rate of more than 500,000 telephones a year. This is a pretty astounding figure when you stop to think that in the non-Bell segment of the industry there are only three companies, other than General Telephone that have as many as 500,000 telephones in total. They are United Utilities, Central Telephone, and Continental. So, every year we add more just through internal growth than all of the rest of the industry, save these three companies, put together. * * * *Still, a very important part of our growth has resulted from acquisitions and mergers.* " * * * The Gary Company that I was originally associated with came in through merger in 1955. Certainly Sylvania and Lenkurt were acquired companies, and in the telephone side of the business, we were very successful in acquiring other telephone companies and spreading ourselves out. This is extremely important in the telephone business because *telephone companies have franchises*. They're regulated monopolies in the areas that they serve, and the only way that you can branch out to serve a territory that you do not presently serve is through acquisitioning the company that has that franchise.

"This is not true, of course, in the manufacturing side of our business, where we do business in all 50 states and throughout the world. Therefore, in our opinion it becomes more and more important to acquire other telephone companies so that we can participate in the growth of the areas that they serve, which we could not otherwise get into. When the Department of Justice filed suit against us in 1964 just prior to our merger with the Western Utilities Group, it was a serious thing for us because for the first time our program of acquiring other independent telephone companies throughout the country was challenged. * * *

---

20. The Hawaiian acquisition had been "closed out finally" the afternoon before.

"[The Department of Justice] advised us that they were going to seek an injunction to stop the merger." * * * [O]ver the last 2½ years we've had many meetings with * * * the Department of Justice—the Attorney General, the head of the Antitrust Division, many of the staff members. During that time we made a great deal of progress in educating them on the fact that the telephone business was different from most industrial businesses, that this was in the public interest. Again we achieved an unprecedented victory when, on the 14th of November, they dismissed this case without any strings attached, with no restrictions whatsoever.

"This, of course, meant that we were not only once more free to go ahead with our acquisition program in the telephone side, but * * * [it] permitted us to do it even with more assurance than we had before * * *. [T]he Department of Justice * * * now having challenged us and finally agreed with us that it wasn't violating the antitrust laws, it seems reasonable to expect that now we can move ahead without fear of interference from them.

"Well, as you might expect, during the 2½ years that our hands were tied on acquisitions we weren't exactly sitting around moping. We were out talking to people that we would like to marry up with some day and doing all the necessary ground work to condition their minds to joining the System. As a result, when the case was dismissed on the 14th, all hell broke loose at 730 Third Avenue [GTE Home Office] * * *.

\* \* \* \* \* \*

"Well, * * * we have a great company * * *. We have this great mix with half of our business being in manufacturing, half of it in telephone operations." (Emphasis added.) PX 2, pp. 2–7, 9.

61. GTE's acquisition of Hawaiian appears similarly motivated. Between 1962 and 1966, Hawaiian purchased from AE (Lenkurt) between about 27%–40% per year of its *total* purchases and its purchases from AE (Lenkurt) of telephone equipment (excluding wire and cable) appear to have been about 60%–70% of that market. In 1969 Hawaiian's *total* purchases were over $39 million, of which some $7 million in telephone equipment was supplied by competing manufacturers and over $19 million by AE (Lenkurt) (including wire and cable).[21] It is notable that at no time before merger had AE ever reached the 80%–86% sales levels, normal with GTE's telephone companies. An inference of the motive behind the acquisition might be drawn, if necessary, from the fact that in the period of April–September 1966, before the merger news broke, Hawaiian's common stock had sold on the New York Exchange between a low of $23½ and a high of $35⅛. During that same period GTE's common sold between $35⅝ and $46.[22] GTE's 1966 earnings were $2.16 per share; Hawaiian's were $1.78. GTE's 1966 cash dividend was $1.20 per share; Hawaiian's was $0.91.[23] Nevertheless, GTE agreed to exchange its common on a share for share basis with Hawaiian!

62. Upon the Department of Justice dismissal of its antitrust GTE–Western Utilities merger action in 1965, GTE accelerated its horizontal acquisition program, accelerated its attempts to take over as many independent telephone companies as possible to become the independents' "Bell." Admittedly GTE has been but following the ideology and example of Bell: vertical integration is "the way of life"—"in-house pur-

---

**21.** This market data comes from Hawaiian's Report of November 12, 1970, to the Hawaii PUC under its Docket No. 1871. As a public record, supplied by defendant, and judicially noticed, it is marked "Court's Ex. 1." In the computation of AE's percent of Hawaiian's telephone equipment market, the court has omitted purchases by Hawaiian from Amfac, Gas-

pro and "Other". Hawaiian constitutes the entire relevant market available to competition by suppliers. Certainly, trade in that relevant market was and is substantial.

**22.** PX 364.

**23.** *Ibid.*

chasing", etc.—and as it grabbed operating companies out of the open competitive market, their equipment business was given to AE.

## VI. *Market Foreclosure*

63. The parties have agreed that for purposes of determination of plaintiff's claim under Section 1 of the Sherman Act, the following figures, although estimates, may be deemed actual. They are said to set forth the percentage that purchases by General System operating companies from affiliated suppliers represented of total purchases of telephone equipment in the relevant market and I find that they do:

| Year | Percentage |
|------|------------|
| 1954 | 3.23 |
| 1955 | 4.27 |
| 1956 | 4.37 |
| 1957 | 4.94 |
| 1958 | 5.03 |
| 1959 | 5.22 |
| 1960 | 5.22 |
| 1961 | 5.41 |
| 1962 | 5.51 |
| 1963 | 5.60 |
| 1964 | 6.46 |
| 1965 | 6.55 |
| 1966 | 6.65 |
| 1967 | 7.03 |
| 1968 | 7.31 |
| 1969 | 7.41 |

64. The parties have agreed that for purposes of determination of plaintiff's claim under Section 1 of the Sherman Act, the following figures, although estimates, may be deemed actual. They are said to set forth the percentage that purchases by General System operating companies from affiliated suppliers represented of all purchases of telephone equipment in the relevant market by purchasers other than Bell System operating companies and I find that they do:

| Year | Percentage |
|------|------------|
| 1954 | 18.86 |
| 1955 | 25.42 |
| 1956 | 24.60 |
| 1957 | 27.88 |
| 1958 | 28.70 |
| 1959 | 29.52 |
| 1960 | 29.52 |
| 1961 | 30.34 |
| 1962 | 30.34 |
| 1963 | 30.34 |
| 1964 | 34.44 |
| 1965 | 34.44 |
| 1966 | 35.26 |
| 1967 | 36.90 |
| 1968 | 37.72 |
| 1969 | 37.72 |

### Subappendix 1

### D. General Industry Facts (Bell and Independent Industries)

9. The number of telephones (sometimes referred to as "stations") in the United States owned and operated as indicated below for each year from 1935 to 1969 inclusive are (000 omitted):

| Year | U. S. | U. S. Non-Bell | Non-Bell % of Total U. S. | General System U. S. (Company-Owned) | General System's % of Total U. S. | General System's % of Non-Bell |
|------|-------|----------------|---------------------------|--------------------------------------|-----------------------------------|--------------------------------|
| 1935 | 17,465 | 3,185 | 18% | 381 | 2.2% | 12% |
| 1936 | 18,498 | 3,306 | 18 | 410 | 2.2 | 12 |
| 1937 | 19,523 | 3,426 | 18 | 444 | 2.3 | 13 |
| 1938 | 20,082 | 3,546 | 18 | 460 | 2.3 | 13 |
| 1939 | 20,995 | 3,666 | 17 | 502 | 2.4 | 14 |
| 1940 | 22,097 | 3,786 | 17 | 532 | 2.4 | 14 |
| 1941 | 23,648 | 3,906 | 17 | 579 | 2.4 | 15 |
| 1942 | 25,026 | 4,026 | 16 | 611 | 2.4 | 15 |
| 1943 | 26,446 | 4,146 | 16 | 644 | 2.4 | 16 |
| 1944 | 26,919 | 4,266 | 16 | 670 | 2.5 | 16 |
| 1945 | 27,973 | 4,426 | 16 | 696 | 2.5 | 16 |
| 1946 | 31,725 | 4,825 | 15 | 833 | 2.6 | 17 |
| 1947 | 34,994 | 5,221 | 15 | 948 | 2.7 | 18 |
| 1948 | 38,347 | 5,648 | 15 | 1,073 | 2.8 | 19 |
| 1949 | 40,862 | 6,086 | 15 | 1,187 | 2.9 | 20 |
| 1950 | 43,170 | 6,374 | 15 | 1,306 | 3.0 | 20 |

| Year | U. S. | U. S. Non-Bell | Non-Bell % of Total U. S. | General System U. S. (Company-Owned) | General System's % of Total U. S. | General System's % of Non-Bell |
|---|---|---|---|---|---|---|
| 1951 | 45,822 | 6,880 | 15 | 1,404 | 3.1 | 20 |
| 1952 | 48,255 | 7,240 | 15 | 1,527 | 3.2 | 21 |
| 1953 | 50,387 | 7,577 | 15 | 1,680 | 3.3 | 22 |
| 1954 | 53,090 | 7,996 | 15 | 1,804 | 3.4 | 23 |
| 1955 | 56,490 | 8,161 | 14 | 2,548 | 4.5 | 31 |
| 1956 | 60,460 | 9,117 | 15 | 2,775 | 4.6 | 30 |
| 1957 | 63,918 | 9,677 | 15 | 3,330 | 5.2 | 34 |
| 1958 | 66,949 | 10,190 | 15 | 3,565 | 5.3 | 35 |
| 1959 | 70,901 | 10,791 | 15 | 3,874 | 5.5 | 36 |
| 1960 | 74,424 | 11,435 | 15 | 4,107 | 5.5 | 36 |
| 1961 | 77,582 | 12,074 | 16 | 4,411 | 5.7 | 37 |
| 1962 | 81,109 | 12,717 | 16 | 4,684 | 5.8 | 37 |
| 1963 | 84,619 | 13,468 | 16 | 4,984 | 5.9 | 37 |
| 1964 | 88,976 | 14,317 | 16 | 6,013 | 6.8 | 42 |
| 1965 | 93,866 | 15,233 | 16 | 6,437 | 6.9 | 42 |
| 1966 | 99,006 | 16,193 | 16 | 6,885 | 7.0 | 43 |
| 1967 | 103,971 | 17,195 | 17 | 7,729 | 7.4 | 45 |
| 1968 | 109,515 | 18,393 | 17 | 8,482 | 7.7 | 46 |
| 1969 | 115,501 | 19,559 | 17 | 9,022 | 7.8 | 46 |

(GTE Vol. III, Interrogatories and Stipulations, ITT Ex. F).

Subappendix 2

10. The gross operating revenues of telephone companies or systems in the United States for each of the years 1935 to 1969 inclusive are as set forth below ($000,000 omitted):

| Year | Total U. S. | U. S. Non-Bell (Including General) | Non-Bell % of Total U. S. | General System U. S. | General System's % of Total U. S. | General System's % of Non-Bell |
|---|---|---|---|---|---|---|
| 1935 | $ 1,042 | $ 95 | 9% | $ 11 | 1.1% | 12% |
| 1936 | 1,122 | 100 | 9 | 12 | 1.1 | 12 |
| 1937 | 1,186 | 107 | 9 | 13 | 1.1 | 12 |
| 1938 | 1,193 | 112 | 9 | 15 | 1.3 | 14 |
| 1939 | 1,253 | 116 | 9 | 18 | 1.4 | 16 |
| 1940 | 1,327 | 122 | 9 | 20 | 1.5 | 17 |
| 1941 | 1,462 | 128 | 9 | 22 | 1.5 | 17 |
| 1942 | 1,650 | 142 | 9 | 24 | 1.5 | 17 |
| 1943 | 1,846 | 154 | 8 | 28 | 1.5 | 18 |
| 1944 | 1,982 | 167 | 8 | 30 | 1.5 | 18 |
| 1945 | 2,164 | 181 | 8 | 32 | 1.5 | 18 |
| 1946 | 2,357 | 201 | 9 | 38 | 1.6 | 19 |
| 1947 | 2,510 | 222 | 9 | 44 | 1.8 | 20 |
| 1948 | 2,952 | 253 | 9 | 53 | 1.8 | 21 |
| 1949 | 3,257 | 287 | 9 | 61 | 1.9 | 21 |
| 1950 | 3,669 | 324 | 9 | 70 | 1.9 | 22 |
| 1951 | 4,100 | 367 | 9 | 85 | 2.1 | 23 |
| 1952 | 4,557 | 416 | 9 | 101 | 2.2 | 24 |
| 1953 | 5,009 | 479 | 10 | 128 | 2.6 | 27 |
| 1954 | 5,433 | 526 | 10 | 142 | 2.6 | 27 |
| 1955 | 6,021 | 596 | 10 | 206 | 3.4 | 35 |
| 1956 | 6,614 | 648 | 10 | 232 | 3.5 | 36 |
| 1957 | 7,201 | 734 | 10 | 283 | 3.9 | 39 |
| 1958 | 7,747 | 809 | 10 | 316 | 4.1 | 39 |
| 1959 | 8,487 | 916 | 11 | 368 | 4.3 | 40 |
| 1960 | 9,131 | 1,020 | 11 | 410 | 4.5 | 40 |

| Year | U. S. | U. S. Non-Bell (Including General) | Non-Bell % of Total U. S. | General System U. S. | General System's % of Total U. S. | General System's % of Non-Bell |
|---|---|---|---|---|---|---|
| 1961 | 9,744 | 1,127 | 12 | 453 | 4.6 | 40 |
| 1962 | 10,448 | 1,254 | 12 | 506 | 4.8 | 40 |
| 1963 | 11,172 | 1,376 | 12 | 569 | 5.1 | 41 |
| 1964 | 12,068 | 1,519 | 13 | 699 | 5.8 | 46 |
| 1965 | 12,990 | 1,670 | 13 | 765 | 5.9 | 46 |
| 1966 | 14,298 | 1,879 | 13 | 846 | 5.9 | 45 |
| 1967 | 15,337 | 2,026 | 13 | 974 | 6.4 | 48 |
| 1968 | 16,734 | 2,305 | 14 | 1,139 | 6.8 | 49 |
| 1969 | 18,672 | 2,614 | 14 | 1,288 | 6.9 | 49 |

(GTE Vol. III, Interrogatories and Stipulations, ITT Ex. M).

Subappendix 3

11. The total gross plant investment of telephone companies or systems in the United States for each of the years 1935 to 1969 inclusive are as set forth below ($000,000 omitted):

| Year | Total U. S. | U. S. Non-Bell (Including General) | Non-Bell % of Total U. S. | General System U. S. | General System's % of Total U. S. | General System's % of Non-Bell |
|---|---|---|---|---|---|---|
| 1935 | $ 4,805 | $ 596 | 12% | $ 65 | 1.4% | 11% |
| 1936 | 4,975 | 582 | 12 | 67 | 1.3 | 12 |
| 1937 | 5,112 | 582 | 11 | 71 | 1.4 | 12 |
| 1938 | 5,237 | 603 | 12 | 89 | 1.7 | 15 |
| 1939 | 5,348 | 609 | 11 | 94 | 1.8 | 15 |
| 1940 | 5,513 | 613 | 11 | 96 | 1.7 | 16 |
| 1941 | 5,823 | 613 | 11 | 103 | 1.8 | 17 |
| 1942 | 6,086 | 620 | 10 | 106 | 1.7 | 17 |
| 1943 | 6,158 | 597 | 10 | 107 | 1.7 | 18 |
| 1944 | 6,281 | 593 | 9 | 109 | 1.7 | 18 |
| 1945 | 6,512 | 610 | 9 | 112 | 1.7 | 18 |
| 1946 | 7,097 | 656 | 9 | 131 | 1.8 | 20 |
| 1947 | 8,341 | 751 | 9 | 155 | 1.9 | 21 |
| 1948 | 9,716 | 829 | 9 | 189 | 1.9 | 23 |
| 1949 | 10,688 | 961 | 9 | 227 | 2.1 | 24 |
| 1950 | 11,501 | 1,086 | 9 | 270 | 2.3 | 25 |
| 1951 | 12,523 | 1,231 | 10 | 318 | 2.5 | 26 |
| 1952 | 13,746 | 1,393 | 10 | 373 | 2.7 | 27 |
| 1953 | 15,041 | 1,579 | 10 | 434 | 2.9 | 27 |
| 1954 | 16,363 | 1,795 | 11 | 488 | 3.0 | 27 |
| 1955 | 17,842 | 2,043 | 11 | 672 | 3.8 | 33 |
| 1956 | 19,879 | 2,323 | 12 | 773 | 3.9 | 33 |
| 1957 | 22,486 | 2,805 | 12 | 1,027 | 4.6 | 37 |
| 1958 | 24,444 | 3,190 | 13 | 1,183 | 4.8 | 37 |
| 1959 | 26,432 | 3,584 | 14 | 1,352 | 5.1 | 38 |
| 1960 | 28,778 | 4,023 | 14 | 1,517 | 5.3 | 38 |
| 1961 | 31,125 | 4,504 | 14 | 1,676 | 5.4 | 37 |
| 1962 | 33,746 | 5,055 | 15 | 1,876 | 5.6 | 37 |
| 1963 | 36,515 | 5,616 | 15 | 2,064 | 5.7 | 37 |
| 1964 | 39,671 | 6,241 | 16 | 2,637 | 6.6 | 42 |
| 1965 | 43,252 | 6,974 | 16 | 2,981 | 6.9 | 43 |
| 1966 | 47,267 | 7,900 | 17 | 3,385 | 7.2 | 43 |
| 1967 | 51,438 | 8,882 | 17 | 4,074 | 7.9 | 46 |
| 1968 | 56,122 | 9,985 | 18 | 4,696 | 8.4 | 47 |
| 1969 | 61,919 | 11,393 | 18 | 5,357 | 8.7 | 47 |

(GTE Vol. III, Interrogatories and Stipulations, ITT Ex. G).

Subappendix 4

12. The number of telephone operating companies in the United States for each of the years from 1935 to 1969 inclusive is set forth below:

| Year | Approximate Total Number of Companies (Including Bell & General) | Bell System Companies | General System Companies |
|------|------|------|------|
| 1935 | 6,627 | 24 | 13 |
| 1936 | 6,497 | 24 | 12 |
| 1937 | 6,587 | 24 | 12 |
| 1938 | 6,553 | 24 | 17 |
| 1939 | 6,502 | 24 | 16 |
| 1940 | 6,515 | 24 | 14 |
| 1941 | 6,847 | 24 | 18 |
| 1942 | 6,815 | 24 | 18 |
| 1943 | 6,780 | 24 | 17 |
| 1944 | 6,656 | 24 | 18 |
| 1945 | 6,117 | 24 | 20 |
| 1946 | 6,007 | 24 | 28 |
| 1947 | 5,882 | 23 | 30 |
| 1948 | 5,773 | 23 | 21 |
| 1949 | 5,673 | 23 | 20 |
| 1950 | 5,565 | 23 | 15 |
| 1951 | 5,469 | 23 | 15 |
| 1952 | 5,324 | 23 | 15 |
| 1953 | 5,143 | 23 | 16 |
| 1954 | 4,984 | 23 | 16 |
| 1955 | 4,737 | 23 | 39 |
| 1956 | 4,413 | 23 | 30 |
| 1957 | 4,137 | 23 | 20 |
| 1958 | 3,891 | 23 | 21 |
| 1959 | 3,584 | 23 | 26 |
| 1960 | 3,324 | 23 | 26 |
| 1961 | 3,060 | 24 | 31 |
| 1962 | 2,870 | 24 | 34 |
| 1963 | 2,700 | 24 | 36 |
| 1964 | 2,560 | 24 | 35 |
| 1965 | 2,447 | 24 | 32 |
| 1966 | 2,270 | 24 | 32 |
| 1967 | 2,126 | 24 | 34 |
| 1968 | 1,997 | 25 | 35 |
| 1969 | 1,919 | 25 | 33 |

(GTE Vol. III, Interrogatories and Stipulations, ITT Ex. N).